IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| FLIR Systems, Inc.<br>    an Oregon Corporation,<br><br>                Plaintiff,<br><br>        v.<br><br>Sierra Media, Inc, a<br>Washington Corporation; Fluke<br>Corporation, a Washington<br>Corporation,<br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. CV-10-971-HU<br><br><br>OPINION AND ORDER |

Charles Dunham Biles
Michael Collins
Bickel & Brewer
4800 Camerica Bank Tower
1717 Main St.
Dallas, TX 75021

Devon Zastrow Newman
Schwabe Williamson & Wyatt, PC
1600-1900 Pacwest Center
1211 SW Fifth Avenue
Portland, OR 97204

        Attorneys for Plaintiff

Benjamin N. Souede
Angeli Law Group LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204

        Attorney for Defendant Sierra Media

Dane H. Butswinkas
Matthew V. Johnson
Williams & Connolly LLP
725 Twelfth Street NW
Washington, DC 20005

Kenneth R. Davis, II
Parna A. Mehrbani
Lane Powell P.C.
601 S.W. Second Avenue
Suite 2100
Portland, OR 97204-3158

   Attorneys for Defendant Fluke Corporation


HUBEL; Magistrate Judge,

   Plaintiff FLIR Systems, Inc. brought claims against Defendant Fluke Corp. and its media consultant, defendant Sierra Media, Inc. for (1) false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), (2) trade libel/commercial disparagement, (3) intentional interference with prospective economic relations, (4) civil conspiracy, (5) aiding and assisting, and (6) for declaratory relief concerning an alleged trademark. Before the court are defendants' motions to dismiss claims two, three, four, and five. For the reasons set forth below, defendants motions are granted, in part, and denied, in part.

### Facts

   Plaintiff FLIR Systems, Inc. is a business that designs, manufactures, and markets thermal imaging cameras. Defendant Fluke Corp. is a competitor of FLIR that manufactures and distributes electronic test tools as well as thermal imaging cameras. According to FLIR, Defendant Sierra Media, Inc. has had a business relationship with Fluke for 15 years, and serves as Fluke's media and marketing company. First Am. Compl. ¶ 10.

OPINION AND ORDER 2

1   The present conflict between the parties stems from a video that
2   Fluke and Sierra created together.

3       In September 2009, Fluke and Sierra worked together to
4   create a video ("the Video") that compared "drop test" results of
5   thermal imaging equipment manufactured by Fluke to four competing
6   products, three of which were manufactured by FLIR.  The video
7   shows products from the two companies dropping two meters onto a
8   concrete floor.  In the video, the Fluke equipment bounces, but
9   appears to remain intact.  The other products appear to either
10  break or have battery covers come off and batteries eject, or
11  both.  There are no spoken words in the video, although
12  periodically text appears embedded in the video.  In order, the
13  text reads: "Fluke thermal imagers.  Rugged.  5 thermal imagers.
14  2 meter drop.  Solid concrete floor.  All products subjected to
15  identical tests by third party.  Fluke Ti32-17 drops and
16  counting...  The ONLY rugged thermal imager.  Why waste money on
17  tools that break?  Get a demo today.  1-800-760-4523.
18  www.fluke.com/demo."  The video is found on YouTube at
19  http://www.youtube.com/watch?v=bFFpWq9h5Ls.

20      Immediately below the Video, on YouTube, the words, "View
21  our Test Methodology here: http://bit.ly/cxlvBB - Fluke
22  Thermography contracted a 3rd party to perform and film this drop
23  test video."  The Test Methodology link leads to a PDF of
24  document titled Thermal Imager Drop Test Video Methodology, which
25  is printed on letterhead reading "sierra media digital media
26  production and post," and is dated January 20, 2010.  It reads,
27  in part,
28  ///

OPINION AND ORDER 3

Sierra Media was contracted under Fluke Corporation to perform and film an independent, third party drop test, and warrants that the following test was executed under controlled conditions:

Products tested:

- Flir I-7 Thermal Imager, Flir I-60 Thermal Imager, Flir T-400 Thermal    Imager, Fluke Ti32 Thermal Imager, Testo 880-3 Thermal Imager.

- All imagers were new or like-new, with no prior usage in commercial or industrial environments. Certifications and serial numbers are on file.

. . . .

Methodology:

- All thermal imager drops occurred during a 12 hour period in the same location under a controlled environment

- All imagers were dropped multiple times from a height of 2 meters off a drop mechanism to the same location on a solid concrete floor

- All imagers were placed on the drop mechanism as consistently as their form factor allowed (T-400 and I-60 were placed on their bottoms and the I-7, Ti32 and Testo 880-1 on their sides)

Daniel A. Cardenas
Producer/Director

Daniel Cardenas is a director at Sierra.

According to FLIR, "In the Video, Fluke and Sierra represent to FLIR and Fluke customers and potential customers that independently designed, conducted, and filmed tests were conducted by Sierra.  Sierra knew the representation was false-Fluke controlled the design of the test and participated in the editing of the Video."  First. Am. Compl. ¶ 13.  FLIR alleges that Sierra allowed Fluke to create and revise the testing methodology and put it on Sierra's letterhead, while representing that Sierra was an "independent, third party."  Id.  FLIR further

OPINION AND ORDER 4

1  alleges that Sierra's founder, Daniel Cardenas, was aware of this

2  when he signed a methodology document and permitted it to be

3  published together with the Video.

4       In general, FLIR alleges that Fluke and Sierra

5  selectively edited the video to make it seem like Fluke cameras

6  survive falls to the floor, and competing products like FLIR's

7  always break.

8      FLIR alleges it lost prospective clients because of the

9  video.  Specifically, FLIR alleges,

10         [I]n August 2010, FLIR lost a sale to a Fortune 100
           company as a direct result of the video.  Specifically,
11         an employee at this Fortune 100 company was required by
           his superior to purchase the Fluke Camera rather than
12         one of the FLIR Cameras because, after watching the
           Video, the employee's boss stated that FLIR's cameras
13         are 'way too sensitive if they get dropped.'  In
           addition, two other potential customers–a building
14         inspection company and a heating and air conditioning
           company–have indicated that because of the Video they
15         may purchase a Fluke Camera rather than a FLIR
           Camera[.]
16
   First Am. Compl. ¶ 40.
17                              **Standard**

18      A motion to dismiss under Rule 12(b)(6) will be granted if

19  plaintiff fails to allege the "grounds" of his "entitlement to

20  relief."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127

21  S. Ct. 1955, 1964-65 (2007) (quotation omitted) (abrogating

22  Conley v. Gibson, 355 U.S. 41, 45-46 (1957) and its test that "a

23  complaint should not be dismissed for failure to state a claim

24  unless it appears beyond doubt that the plaintiff can prove no

25  set of facts in support of his claim").  The plaintiff must plead

26  affirmative factual content that "allows the court to draw the

27  reasonable inference that the defendant is liable for the

28  misconduct alleged."  Ashcroft v. Iqbal, -- U.S. --, 129 S. Ct.

   OPINION AND ORDER 5

1  1937, 1949 (2009).  The affirmative factual content requirement
2  demands "more than labels and conclusions, [or] a formulaic
3  recitation of the elements of a cause of action." <u>Twombly</u>, 550
4  U.S. at 555.  "In sum, for a complaint to survive a motion to
5  dismiss, the non-conclusory 'factual content,' and reasonable
6  inferences from that content, must be plausibly suggestive of a
7  claim entitling the plaintiff to relief." <u>Moss v. United States</u>
8  <u>Secret Serv.</u>, 572 F.3d 962, 969 (9th Cir. 2009) citing <u>Iqbal</u>, 129
9  S. Ct. at 1949.

**Discussion**

10
11      Both Fluke and Sierra move to dismiss the claims for trade
12  libel, intentional interference, and civil conspiracy.  Sierra
13  alone moves to dismiss the aiding and assisting claim.

14      Before delving into the claims at issue, however, it is
15  necessary to explain that the court, in evaluating the motions to
16  dismiss, considered, for context, the Video at issue and the
17  methodology document that accompanied it under the "incorporation
18  by reference" rule.  "In doing so, [the court] deviate[d] from
19  the general rule that courts, when ruling on a motion to dismiss,
20  must disregard facts that are not alleged on the face of the
21  complaint or contained in documents attached to the complaint.
22  <u>Knievel v. ESPN</u>, 393 F.3d 1068, 1076 (9th Cir. 2005).  This
23  approach is permissible under the "incorporation by reference"
24  doctrine, which permits the court to take into account documents
25  "whose contents are alleged in a complaint and whose authenticity
26  no party questions, but which are not physically attached to the
27  plaintiff's pleading." <u>Id.</u>

28      The video and the methodology document are found at

OPINION AND ORDER 6

1    http://www.youtube.com/watch?v=bFFpWq9h5Ls and

2    http://bit.ly/cxlvBB, respectively.

3    I.    Count Two: Trade Libel/Commercial Disparagement

4         This court has previously held, "To prevail on its state law

5    trade libel claim, plaintiff must prove that defendant published

6    false allegations regarding [the plaintiff] with malice, and that

7    plaintiff has, as a result, suffered special damages or pecuniary

8    harm." Soloflex, Inc. v. NordicTrack, Inc., No. CV 93-545-JE,

9    1994 WL 568401, at *13 (D. Or. Feb. 11, 1994) (citing Woodard v.

10   Pacific Fruit & Produce Co., 165 Or. 250, 106 P.2d 1043, 1045

11   (1940)).  Thus, to state a claim for trade libel, the plaintiff

12   must allege that the defendant (1) published (2) one or more

13   false allegations (3) pertaining to plaintiff, (4) with malice,

14   and (5) as a result, (6) the plaintiff suffered damages.  False

15   allegations means "false . . . statements." Woodard, 165 Or. at

16   255.

17        FLIR argues that Fluke and Sierra published at least two

18   false statements.  First, FLIR alleged in the Complaint the

19   falsity of the statement that Sierra conducted an "independent,

20   third party drop test."  Second, FLIR alleges that the statement,

21   "Fluke Ti32-17 drops and counting... The ONLY rugged thermal

22   imager," displayed after the video shows the FLIR cameras

23   breaking and the Fluke camera bouncing, states falsely that FLIR

24   cameras break immediately when dropped, but Fluke cameras can be

25   dropped over and over without breaking.  Fluke  and Sierra argue

26   that FLIR alleges only omissions of facts they wish had been

27   included, such as how many times the FLIR cameras were actually

28   dropped before they broke.  Fluke and Sierra contend that

OPINION AND ORDER 7

omissions are not actionable.

An Oregon district court case <u>Soloflex, Inc. v. NordicTrack, Inc.</u>, No. CV 93-545-JE, 1994 WL 568401, at *13 (D. Or. Feb. 11, 1994), illustrates the contours of what must be alleged to state a claim for trade libel.

In <u>Soloflex, Inc.</u>, the plaintiff, a maker of home exercise equipment, sued defendant NordicTrack, Inc., a competitor, alleging that defendant's infomercials were too similar to plaintiff's infomercials. 1994 WL 568401, at *1. One of the six claims against defendant was for common law trade libel. <u>Id.</u>. The defendant moved for summary judgment against plaintiff's six claims, and Judge Jelderks denied summary judgment on, among others, the trade libel claim. Judge Jelderks discussed the trade libel claim:

> To prevail on its state law trade libel claim, plaintiff must prove that defendant published false allegations regarding Soloflex with malice, and that plaintiff has, as a result, suffered special damages or pecuniary harm. <u>Woodard v. Pacific Fruit & Produce Co.</u>, 165 Or. 250, 106 P.2d 1043, 1045 (1940). Defendant argues only that plaintiff cannot meet this burden because defendant has demonstrated the "truth" of each and every advertising claim made by NordicTrack and that every claim is backed up by substantial, credible research.
>
> Because I have found that questions of fact exist as to whether defendant's advertising claims are false, summary judgment cannot be granted on plaintiff's trade libel claim. This court cannot rule as a matter of law that defendant did not publish with malice or that plaintiff has not suffered special damages or pecuniary harm due to defendant's allegedly false advertising. I therefore deny defendant's motion for summary judgment on this claim.

<u>Id.</u> at *13-14. The claims under the Lanham Act and for trade libel related to allegedly "false visual and textual representations regarding the natural strength curve, and the

OPINION AND ORDER 8

1  resistance curves of NordicFlex and Soloflex in relation to the
2  natural strength curve." Id. at *3-5.  On defendant's motion for
3  summary judgment on the claims, defendant argued that plaintiff
4  could not prove the falsity of the claims and could not prove
5  that the statements were material and deceiving.  Id. at *5.  The
6  court simply concluded, "At issue are an array of expert opinions
7  offered by both sides. Those opinions offer experienced and
8  credible expertise regarding the exercise issues raised by
9  plaintiff in its false advertising claim. There are clearly many
10 disputed issues of material fact that prevent the entry of
11 summary judgment on this claim." Id. at *6.

12     Soloflex demonstrates that a trade libel claim can be based
13 on words, pictorial depictions, or some combination of the two.
14 Judge Jelderks denied summary judgment on a trade libel claim
15 that involved false visual and textual representations of a
16 strength curve, because he found that there were disputed issues
17 of fact about whether it was false.  Oregon case law, therefore,
18 leaves open the possibility of a trade libel claim where part of
19 the statement is made through a video representation.

20     Defendants cite two cases, Auvil v. CBS 60 Minutes, 67 F.3d
21 816, 822 (9th Cir. 1995) and Pond v. Gen. Elec. Co., 256 F.2d
22 824, 828 (9th Cir. 1958), for the proposition that an omission
23 cannot serve as the basis for a trade libel claim.  I agree with
24 defendants' premise that a bare omission cannot typically serve
25 as the basis for a trade libel claim, but reject their argument
26 at this early stage of this case.  Construed liberally, the
27 language of FLIR's complaint alleges affirmative false statements
28 made by the video and the methodology document, not just

OPINION AND ORDER 9

1  omissions.

2      The First Amended Complaint states that defendants contrived
3  "a commercial advertising campaign that falsely purports to
4  'compare' thermal imaging equipment manufactured by Fluke to
5  thermal imaging equipment manufactured by FLIR."  First. Am.
6  Compl. ¶ 12.  Elsewhere, the First Amended Complaint alleges
7  "defendants made false and disparaging representations about FLIR
8  and FLIR's products."  Id. at ¶ 59.  Plaintiff continued,
9  "Defendants published . . . false and deceptive statements and
10 representations concerning Fluke and FLIR's products, including
11 the false representation that, when dropped from a height of 2
12 meters onto a concrete floor, the FLIR Cameras broke apart upon
13 initial impact, whereas the Fluke camera remained intact and
14 operable."  Id. at ¶ 60.[1]  In addition, FLIR alleged, "Defendants
15 represent that "an independent 3rd party performed and filmed
16 this drop test," but "that representation was false" because
17 "Sierra is Fluke's longtime advertising company[.]"  Id. at ¶¶
18 20, 21.  FLIR alleged that an email from Fluke's marketing
19 manager stated the "Intent is to create the atmosphere of an
20 independent testing lab" and "to load these Videos to YouTube so
21 it looks like its coming from a user or independent source."  Id.
22 at ¶ 25.  Addressing its damages, FLIR alleged that it lost a
23 sale to a Fortune 100 company.  Id. at ¶ 40.

24     The above allegations are sufficient allegations of trade

25

26     [1] At oral argument counsel for Fluke stated that in at least
27 some of the video of FLIR imagers, the footage showing some
   damage occurring was not on the first drop, but after multiple
28 drops.

OPINION AND ORDER 10

libel under <u>Iqbal</u> and <u>Twombly</u>'s requirements.  Accordingly, Fluke
and Sierra's motion is denied with respect to the trade libel
claim.

II.   <u>Count Three: Intentional Interference with Prospective</u>
      <u>Economic Relations</u>

      "To state a claim for intentional interference with economic
relations, a plaintiff must allege each of the following
elements: (1) the existence of a professional or business
relationship (which could include, e.g., a contract or a
prospective economic advantage), (2) intentional interference
with that relationship, (3) by a third party, (4) accomplished
through improper means or for an improper purpose, (5) a causal
effect between the interference and damage to the economic
relationship, and (6) damages." <u>McGanty v. Staudenraus</u>, 321 Or.
532, 536, 901 P.2d 841, 844 (1995).[2]

      Fluke argues that FLIR's First Amended Complaint fails to
adequately state a claim for intentional interference because it
does not allege that a relationship existed between FLIR and the
unnamed potential customers in paragraph 40 of the First Amended
Complaint, and because it does not allege that Fluke knew about
the alleged relationship.  FLIR responds that an actual
relationship between it and the potential customer is not
necessary, and that a prospective relationship, or expectancy of
a relationship are all that are needed to state a claim.

      FLIR cites <u>Allen v. Hall</u>, 328 Or. 276, 974 P.2d 199 (1999)

_____

      [2] The first element has also been stated as " the existence
of a valid business relationship or expectancy." <u>Uptown Heights</u>
<u>Associates Ltd. Partnership v. Seafirst Corp.</u>, 320 Or. 638, 651,
891 P.2d 639, 646 (1995).

OPINION AND ORDER 11

1  in support of its contention that a valid business relationship
2  need not exist at the time of the interference by a third party.
3  In <u>Allen</u>, relatives of a decedent brought an action in federal
4  court against will beneficiaries alleging intentional
5  interference with prospective inheritance.  <u>Id.</u>  The facts of the
6  case involved an elderly gentleman (the decedent) who required
7  in-home care and who wrote a first will leaving all his
8  possessions to his defendant caretakers, and nothing to the
9  plaintiffs.  <u>Id.</u> at 279.  Just days after executing his first
10  will, he wrote a draft of a second will that left possessions to
11  the plaintiffs.  <u>Id.</u>  The decedent, gravely ill, met with his
12  attorney and instructed him to change the will to leave
13  possessions to the plaintiffs.  <u>Id.</u>  When the second version of
14  the will was ready to be executed, the defendants prevented it
15  from happening by checking the decedent into the hospital,
16  falsely telling the attorney that decedent was not lucid to sign
17  a will, falsely claiming to have power of attorney over the
18  decedent, and otherwise obstructing the decedent from signing the
19  second will.  <u>Id.</u>  Decedent died within days, and the plaintiffs
20  sued the defendants for intentional interference with prospective
21  inheritance.  <u>Id.</u>  The Ninth Circuit eventually certified two
22  questions to the Oregon Supreme Court: "(1) Does Oregon recognize
23  the tort of intentional interference with prospective
24  inheritance? (2)  If a tort action for intentional interference
25  with prospective inheritance is available, what are the elements
26  of that tort?"  <u>Id.</u> at 278.  The Oregon Supreme Court
27  reformulated the question as, "Have plaintiffs in this case, who
28  have brought a tort action based on a theory that defendants

OPINION AND ORDER 12

1  wrongfully interfered with a prospective inheritance that

2  otherwise would have gone to plaintiffs, alleged facts which, if

3  proved, would form a basis for relief under Oregon law?"  Id.

4  The court held that the answer was "Yes."  Id.  It began by

5  explaining

> Under Oregon law, an intentional interference with a
> prospective inheritance may be actionable under a
> reasonable extension of the well-established tort known
> as intentional interference with economic relations.
> Although, heretofore, this court has applied that tort
> only to contractual and business relationships and
> prospects, we are persuaded that the tort also may, by
> a reasonable and principled extension, be made
> applicable to some noncommercial relationships and
> prospects, such as the one alleged by plaintiffs in the
> present case.

12 Id. at 281.  The court based its reasoning on "the very close

13 analogy that exists between an expectancy of inheritance and

14 those other interests to which this court already has extended

15 the protections of the tort of intentional interference with

16 prospective economic advantage."  Id.  The court did not,

17 however, delve into the type of relationship required to fulfill

18 the first element of a claim for intentional interference with a

19 prospective business relationship.  The entirety of its

20 discussion on this point reads, "plaintiffs have alleged facts

21 that satisfy the first element of the tort, viz., the existence

22 of a prospective economic advantage in the form of a prospective

23 inheritance."  Id. at 285.

24     Allen does not, however, extend the first element of a claim

25 for intentional interference to a relationship that might happen

26 with just anyone.  Rather, Allen concerns a testator who wished

27 to leave assets to specific plaintiffs, directed a draft document

28 to be prepared indicating as much, met with his attorney and

OPINION AND ORDER 13

instructed him to carry out his wishes, and then was blocked from

completing his wishes by a third party.  These facts show parties

who evidenced an intent to enter into a specific testator-

beneficiary relationship, but were blocked from doing so by a

third party.  I find another case more helpful in understanding

the required nature of the relationship which will support this

claim.

In Oregon Life and Health Ins. Guar. Ass'n v. Inter-Regional

Financial Group, Inc., 156 Or. App. 485, 498, 967 P.2d 880, 887

(1998), the Oregon Court of Appeals explained the relationship

element:

> To proceed on its . . . claim, plaintiff must establish
> first that there was a contractual or business
> relationship between plaintiff and a third party in
> which defendant interfered.  See McGanty v.
> Staudenraus, 321 Or. 532, 535, 901 P.2d 841 (1995)
> (listing that factor as one of five elements); see also
> Uptown Heights Associates Ltd. Partnership v. Seafirst
> Corp., 320 Or. 638, 651, 891 P.2d 639 (1995) (same).
> In other words, *the tort does not protect the business*
> *expectations of a single entity; it protects the*
> *contractual or business relationship between a*
> *plaintiff and a third party.* See McGanty,321 Or. at
> 536, 901 P.2d 841 (stating that the "tort serves as a
> means of protecting contracting parties against interference in
> their contracts from *outside* parties" (emphasis in original));
> see also Lewis v. Oregon Beauty Supply Co., 302 Or. 616, 622, 733
> P.2d 430 (1987) (holding that the "salient inquiry in any
> interference claim is whether defendant's tortious conduct
> damaged plaintiff's economic or contractual relationship," which
> could occur by "defendant's interference  causing a third person
> *to discontinue* the relationship with plaintiff."

(emphasis added).

The intent of this tort, therefore, is to protect both

parties to a prospective business relationship from a third party

who would interfere.  This is different from inducing a potential

customer who has had no contact with the plaintiff, whether

initiated by the customer or the plaintiff, to purchase a

OPINION AND ORDER 14

competing product rather than plaintiff's product.  Moreover, the
Court of Appeals' use of the word "discontinue" indicates that
some kind of relationship must exist prior to the action that
allegedly interferes and causes a third person to discontinue
that relationship.  FLIR's comments at oral argument seem to
suggest it is such a large player in the thermal imager market
that anyone who buys one from any supplier, whether or not the
buyer ever had contact with FLIR, is someone with a sufficient
relationship with FLIR to support this tort.  That is not the law
in Oregon.

    The First Amended Complaint states that "FLIR had
prospective economic relationships with various potential
customers, including a Fortune 100 company, a building inspection
company, a heating and air conditioning company, and others."
First. Am. Compl. ¶ 74.  It specifies,

> In August 2010, FLIR lost a sale to a Fortune 100
> company as a direct result of the Video.  Specifically,
> an employee at this Fortune 100 company was required by
> his superior to purchase the Fluke Camera rather than
> one of the FLIR Cameras because, after watching the
> Video, the employee's boss stated that FLIR's Cameras
> are "way too sensitive if they get dropped."  In
> addition, two other potential customers–a building
> inspection company and a heating company and a heating
> and air conditioning company–have indicated that
> because of the Video they may purchase a Fluke Camera
> rather than a FLIR Camera: "the 'Drop Test' has got me
> sold on Fluke unless you can convince me otherwise" and
> "we did meet with Robert Levy of Fluke (RJM Sales) last
> night.  We looked at the TIR unit, and were impressed
> by its ruggedness and large screen.  He showed us a
> video of drop tests of the FLIR and Fluke products,
> where the Fluke bounced and the FLIR's broke . . . very
> impressive."

Id. at ¶ 40.

    These allegations, however, lack a statement specifying that
FLIR and the unnamed prospective customers or others had any sort

OPINION AND ORDER 15

1  of business relationship prior to the customer seeing the Video.
2  The absence of such a statement is fatal to this claim.

3  　　　Fluke argues that even if such a relationship did exist, the
4  absence of an allegation that Fluke knew about it and
5  intentionally interfered is also fatal to the claim.  The Oregon
6  Court of Appeals has explained that a defendant "must have known
7  of the plaintiff's prospective relationship and intentionally
8  interfered with that relationship." United Employer Ben. Corp.
9  v. Department of Ins. and Finance of State of Or., 133 Or. App.
10  477, 487, 892 P.2d 722, 728 (1995).  FLIR argues that it was not
11  necessary to plead Fluke's knowledge specifically because it was
12  obvious that "Fluke knew that every potential customer for
13  thermal imaging cameras is a prospective customer for FLIR."
14  Pl.'s Response Def.'s Mot. Dismiss at 19.  Again, I disagree.

15  　　　The mere possibility that a person or business might buy a
16  product from FLIR in the future is not enough, alone, to create a
17  business relationship for the tort at issue, nor to establish the
18  defendants' knowledge of and intent to interfere with the
19  relationship.  Accordingly, defendants motion to dismiss FLIR's
20  claim for intentional interference with a business relationship
21  is granted.

22  III. Count Four: Civil Conspiracy

23  　　　A civil conspiracy is two or more persons' concerted action
24  to accomplish an unlawful purpose, or to accomplish some purpose
25  not in itself unlawful by unlawful means.  Osborne v. Fadden, 225
26  Or. App. 431, 437, 201 P.3d 278, 282 (2009).  "It is not a
27  separate tort or basis for recovery but, rather, a theory of
28  mutual agency under which a conspirator becomes jointly liable

OPINION AND ORDER 16

1  for the tortious conduct of his or her coconspirators." Id.  "To

2  establish a civil conspiracy, petitioners must establish (1) Two

3  or more persons; (2) an object to be accomplished; (3) a meeting

4  of the minds on the object or course of action; (4) one or more

5  unlawful overt acts; and (5) damages as the proximate result

6  thereof." Id.  "The primary purpose of a conspiracy must be to

7  cause injury to another." Bonds v. Landers, 279 Or. 169, 175,

8  566 P.2d 513, 516 (1977).  Where a civil conspiracy claim is

9  based on alleged misrepresentation, the elements must be plead

10 with particularity pursuant to FRCP 9(b).  See Wasco Prods., Inc.

11 v. Southwall Techs., Inc., 435 F.3d 989, 990 (9th Cir. 2006).

12     Fluke and Sierra argue the civil conspiracy claim must be

13 dismissed because FLIR has not adequately plead a "meeting of the

14 minds" or that the primary purpose of the alleged conspiracy was

15 to harm FLIR.

16     FLIR responds that the facts set forth in the complaint are

17 sufficient to infer a meeting of the minds.  FLIR points to its

18 allegations that (1) Sierra was retained and paid by Fluke to

19 assist in the design, creation, and publishing of the Video,

20 First Am. Compl. ¶¶ 10, 85; (2) Sierra had served as Fluke's

21 media and marketing company for 15 years, First Am. Compl. ¶ 10;

22 (3) Fluke and Sierra acted as a "team" during production of the

23 Video, First Am. Compl. ¶¶ 15, 30; (4) Sierra knew that the

24 depiction of the FLIR and Fluke cameras in the video did not

25 accurately reflect durability, and yet published the video

26 anyway, and (5) as a result of publishing the Video, FLIR lost

27 sales.  First Am. Compl. ¶¶ 15, 18, 19, 30, 39, 40, 60, 61.  FLIR

28 argues that, taken together, these allegations are sufficient to

OPINION AND ORDER 17

1    alleged the elements of civil conspiracy and to show that Fluke

2    and Sierra had a meeting of the minds that the purpose of the

3    Video was, in part, to disparage FLIR's cameras.

4        Fluke and Sierra respond that the meeting of the minds

5    requirement pertains to agreement to accomplish the unlawful

6    acts-in this case, intentionally interfering with FLIR's economic

7    relationships or making a knowingly false statement about FLIR in

8    the drop test video.  They argue that an agreement to make a

9    promotional video that has the purpose of giving Fluke a

10   competitive advantage in the marketplace is different than a

11   conspiracy to make false statements about FLIR.

12       I have dismissed the intentional interference claim.  The

13   underlying issue here is whether the allegation that Fluke and

14   Sierra's had knowledge that the video results pertaining to

15   FLIR's products were false, is sufficient to state a claim that

16   Fluke and Sierra conspired to commit trade libel.  I am persuaded

17   that, at this stage of the proceedings, such allegations are

18   sufficient.  I have held, above, that FLIR's trade libel claim

19   survives because the allegations of the complaint are sufficient

20   state a claim that the words and depictions in the video,

21   together with the methodology document, could be construed to

22   make a knowingly false statement about FLIR's products.  This

23   being the case, there is little doubt that FLIR's allegations

24   sufficiently state that FLIR and Sierra consciously worked

25   together to achieve the joint purpose of promoting Fluke's

26   products while simultaneously making a false statement about

27   FLIR's products.  Accordingly, the motion to dismiss FLIR's claim

28   for civil conspiracy is denied.

OPINION AND ORDER 18

IV.   <u>Count Five: Aiding and Assisting</u>

     FLIR's claim for aiding and assisting, which is directed at defendant Sierra only, is sufficient for the reasons stated above with regard to its claim for civil conspiracy.

     Accordingly, Sierra's motion to dismiss FLIR's claim for aiding and assisting is denied.

**CONCLUSION**

     Defendant Fluke's and defendant Sierra's motions to dismiss [doc. # 40, 42] are granted, in part, and denied, in part. IT IS SO ORDERED.

                         Dated this <u> 10th </u> day of <u>May</u>, 2011.


                                        /s/ Dennis J. Hubel

                                        _____
                                        Dennis James Hubel
                                        United States Magistrate Judge

OPINION AND ORDER 19