1

2

3

4

5

6

7                   **UNITED STATES DISTRICT COURT**

8                       **DISTRICT OF OREGON**

9                       **PORTLAND DIVISION**

10

11

**FLIR SYSTEMS, INC.**, an Oregon                    No. 3:10-cv-00971-HU
12   corporation,
                                                  **OPINION AND ORDER**
13        Plaintiff,

14   v.

15   **SIERRA MEDIA, INC.,** a Washington
     corporation, and **FLUKE CORPORATION,**
16   a Washington corporation,

17        Defendants.
     ─────────────────────────────────
18

19   Devon Zastrow Newman, Schwabe, Williamson & Wyatt, P.C., Portland,
     Oregon, for plaintiff FLIR Systems, Inc.
20
     William A. Brewer III, Michael J. Collins, C. Dunham Biles, and
21   Robert M. Millimet, Bickel & Brewer, Dallas, Texas, for plaintiff
     FLIR Systems, Inc.
22
     Kenneth R. Davis II and Parna A. Mehrbani, Lane Powell P.C.,
23   Portland, Oregon, for defendant Fluke Corporation.

24   Caroline M. McKay, Dane H. Butswinkas, and Matthew V. Johnson,
     Williams & Connolly LLP, Washington, District of Columbia, for
25   defendant Fluke Corporation.

26   Benjamin N. Souede, Angeli Law Group LLC, Portland, Oregon, for
     defendant Sierra Media, Inc.
27

28

     Page 1 - OPINION AND ORDER

**HUBEL, J.,**

Before the Court are four motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c): (1) defendant Fluke Corporation's ("Fluke") motion for summary judgment on its counterclaim for injunctive relief and damages for false advertising under Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), 60 Stat. 441, as amended, 15 U.S.C. § 1125(a); (2) Fluke's motion for summary judgment on plaintiff FLIR Systems, Inc.'s ("FLIR") claims for false advertising, trade libel/ commercial disparagement, and civil conspiracy; (3) defendant Sierra Media's ("Sierra") motion for summary judgment on FLIR's claims for trade libel/ commercial disparagement, civil conspiracy, and aiding and assisting; and (4) FLIR's motion for summary judgment on Fluke's counterclaims for trademark infringement, unfair competition, and false advertising under the Lanham Act, and trademark infringement under Oregon common law.

There is full consent by all parties to adjudication of the case by a magistrate judge pursuant to 28 U.S.C. § 636(c). Having reviewed the papers and pleadings submitted by the parties and having heard oral argument on the pending motions, the Court hereby ORDERS as follows: (1) Fluke's motion (Docket No. 177) for summary judgment on its counterclaim for injunctive relief and damages for false advertising is DENIED; (2) Fluke's motion (Docket No. 178) for summary judgment on FLIR's claims for false advertising, trade libel/ commercial disparagement and civil conspiracy is GRANTED in part and DENIED in part; (3) Sierra's motion (Docket No. 175) for summary judgment is GRANTED in its entirety; and (4) FLIR's motion (Docket No. 176) for summary judgment is DENIED in its entirety.

Page 2 - OPINION AND ORDER

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts essential to this case are relatively straightforward. FLIR deals in infrared cameras, thermography, and thermal imaging equipment. FLIR's products are sold in a wide range of industrial, commercial, and government markets around the world. Fluke is a wholly-owned subsidiary of Danaher Corporation, a publicly traded company, and is in the business of manufacturing, distributing, and servicing electronic test tools and software. Fluke also manufactures and distributes thermal imaging cameras that compete with FLIR's products in interstate commerce. Sierra, on the other hand, is Fluke's long-time media and marketing company. Sierra and Fluke's relationship spans over fifteen years, and Fluke has become one of Sierra's largest customers. Sierra neither manufactures, nor distributes thermal imaging cameras.

In late-2007/ early-2008, after Fluke introduced the Fluke Ti10 and Fluke Ti25 model cameras as its lowest price offerings, FLIR introduced its ix series at an even lower price. FLIR's ix series, which includes the FLIR i3, FLIR i5 and FLIR i7 camera models, are marketed as "entry level" cameras. Since at least 2008, FLIR has used images captured by higher resolution thermal imaging cameras superimposed on the display of lower resolution cameras depicted in its online and print advertising, including advertisements for the ix series. FLIR's vice president of marketing, Allen Frechette ("Frechette"), has admitted that, "[i]f a customer purchased an i3 based on the belief that the images shown in the advertisement for the i3 were in fact from an i3 thermal imaging camera or another 60 by 60 thermal imaging camera,

1  that customer would be mistaken[.]" (Frechette Dep. 234:24-235:4-7,
2  Jan. 30, 2012.)

3      In September of 2009, Fluke and Sierra (collectively,
4  "Defendants") worked together to create a video that compared "drop
5  test" results of thermal imaging equipment manufactured by Fluke to
6  four competing products, including the FLIR i7, FLIR i60, and FLIR
7  T400.  Defendants claimed to have tested the durability, quality
8  and reliability of the thermal imaging cameras by dropping them
9  from a height of two meters onto a concrete floor.  The video
10  depicts the Fluke Ti32 bouncing and appearing to remain intact.
11  With respect to FLIR's cameras, although the video shows each of
12  FLIR's imagers dropping multiple times, including for each imager
13  at least one drop where no visible damage results, it also shows
14  drops that caused exterior damage to FLIR's cameras.  Overall, the
15  video shows nineteen camera drops: five for the Fluke Ti32 and
16  fourteen for the four competing products.  There are no words were
17  spoken in the video, but the following text appears embedded in the
18  video: "Fluke thermal imagers"; "Rugged"; "5 thermal imagers"; "2
19  meter drop"; "Solid concrete floor"; "All products subjected to
20  identical tests by third party"; "Fluke Ti32 . . . 17 drops and
21  counting"; "The ONLY rugged thermal imager"; "Why waste money on
22  tools that break?"; "Get a demo today . . . 1-800-760-4523 . . .
23  www.fluke.com/demo."

24      FLIR filed this suit in August of 2010.  On December 30, 2010,
25  FLIR filed a six-count first amended complaint against Defendants
26  for: (1) false advertising in violation of the Lanham Act (Count
27  One); (2) trade libel/ commercial disparagement (Count Two); (3)
28  intentional interference with prospective economic relations (Count

Page 4 - OPINION AND ORDER

Three); (4) civil conspiracy (Count Four); (5) aiding and assisting (Count Five); and (6) declaratory relief regarding Fluke's alleged "IR Fusion" trademark (Count Six).[1]   Fluke filed an answer and counterclaims on May 27, 2011, asserting, inter alia, causes of action for trademark infringement, unfair competition and false advertising under the Lanham Act, as well as a common law claim for trademark infringement.[2]

## II.   LEGAL STANDARD

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).   Summary judgment is not proper if factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.   *Id.* at 324.   A nonmoving party cannot defeat summary

_____

[1] FLIR's claim for intentional interference with prospective economic relations (Count Three) was dismissed by this Court's Opinion and Order entered on May 10, 2011.

[2] For clarity, background information relevant to Fluke's trademark infringement counterclaim, unfair competition counterclaim, and false advertising counterclaims that do not concern FLIR superimposing higher resolution images on the LCD screen of its lower resolution cameras will be discussed in conjunction with the analysis of FLIR's motion for summary judgment.

Page 5 - OPINION AND ORDER

judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

/// 

/// 

/// 

Page 6 - OPINION AND ORDER

### III. DISCUSSION

#### A. Fluke's Motion for Summary Judgment on its Lanham Act False Advertising Counterclaim [#177]

There are five elements to a false advertising claim under the Lanham Act:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
>
> (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
>
> (3) the deception is material, in that it is likely to influence the purchasing decision;
>
> (4) the defendant caused its false statement to enter interstate commerce; and
>
> (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Skydive Ariz., Inc. v. Quattrochi*, 673 F.3d 1105, 1110 (9th Cir. 2012). Falsity may be established by showing that a statement of fact "was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citation omitted). "When an advertisement is shown to be literally or facially false, consumer deception is presumed, and the court may grant relief without reference to the advertisement's actual impact on the buying public." *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 157 (2d Cir. 2007) (citation and internal quotation marks omitted; alterations deleted).[3]

---

[3] The Lanham Act false advertising claims that are the subject
(continued...)

Page 7 - OPINION AND ORDER

Under the false by necessary implication doctrine, "[a] plaintiff may show that an advertisement is literally false . . . when, considering the advertisement in its full context, the relevant audience would recognize the false implied claim as easily as if it had been stated explicitly." *Pamlab, LLC v. Macoven Pharms., LLC*, -- F. Supp. 2d -- , 2012 WL 2540234, at *4 (S.D.N.Y. June 29, 2012). As the Ninth Circuit explained in *Southland Sod*, "the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other." *Southland Sod,* 108 F.3d at 1139 (quoting *Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, No. 81 Civ 731-CSH, 1982 WL 121559, *2 (S.D.N.Y. June 9, 1982))); *Time Warner Cable*, 497 F.3d at 157 ("The entire mosaic should be viewed rather than each tile separately.")

A subspecies of the false by necessary implication doctrine is a challenge to an advertisment claim based on product testing, *Pamlab*, 2012 WL 2540234, at *5, which courts in other circuits often times refer to as an "establishment claim."[4] *Hansen Beverage Co. v. Vital Pharm., Inc.*, No. 08-cv-1545, 2010 WL 1734960, at *4 (S.D. Cal. Apr. 27, 2010). To prove that an advertisment claim based on product testing is literally false, "the plaintiff must demonstrate such tests are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the

---

[3](...continued)
of Fluke's motions for summary judgement concern advertisements that are allegedly literally false.

[4] FLIR's Lanham Act false advertising claim based on the production of the drop video is properly characterized as a product testing claim.

Page 8 - OPINION AND ORDER

claim made." *Southland Sod*, 108 F.3d at 1139 (internal quotation marks and citation omitted).    This burden may be met by: (1) attacking the validity of the defendant's test directly; (2) showing the defendant's tests are contradicted or unsupported by other scientific evidence; or (3) showing "that the tests, even if reliable, do not establish the proposition asserted by the defendant[.]" *Id.*

*1. Are FLIR's Advertisements Literally False?*

Fluke contends that the undisputed material facts establish that FLIR's advertising practice -- using images from higher resolution (and more expensive) thermal imaging cameras on the displays of lower resolution (and less expensive) cameras pictured in its advertising -- is literally false.    An example of literal falsity, according to Fluke, is FLIR's 2008 brochure for the Extech/Flir i5, which has a detector resolution of 80 x 80 pixels. On the front page of the 2008 brochure is a picture of the i5 with a thermal image of three fuses on its screen.    It is undisputed that the image of the three fuses was taken by a camera with a resolution of 320 x 240 pixels.    Because that image is from a high-resolution camera, it is of a better image quality than the i5 model could produce (320 x 240 = 76,800 pixels versus 80 x 80 = 6,400 pixels).    By cutting and pasting the 320 x 240 image onto the i5's LCD screen, it is Fluke's position that FLIR is representing to consumers that the i5 creates an image of 320 x 240 quality.

FLIR contends its advertisements are not literally false.    In fact, FLIR knows that its advertised cameras cannot attain the image quality of the displayed thermal images; however, FLIR claims "the intention of the Advertisements is merely to show how the

Page 9 - OPINION AND ORDER

1 images are displayed on the thermal imaging camera," not "to
2 present precise representations of the quality capabilities of the
3 advertised cameras." (Pl.'s Am. Resp. at 1.)

4     A District Court in this circuit has stated in dicta that "an
5 advertisement can be literally false even though it does not
6 explicitly make a false assertion, if the words and images,
7 considered in context, necessarily and unambiguously imply a false
8 message." *CertainTeed Corp. v. Seattle Roof Brokers*, No. C09-
9 563RAJ, 2010 WL 2640083, at *10 (W.D. Wash. June 28, 2010)
10 (citation omitted).

11     An instructive example of such as case is provided by the
12 Eight Circuit's decision in *Rhone-Poulenc Rorer Pharm., Inc. v.*
13 *Marion Merrell Dow*, 93 F.3d 511 (8th Cir. 1996). There, the
14 advertisement at issue featured "images such as two similar gasoline
15 pumps or airline tickets with dramatically different prices,
16 accompanied by the slogan, 'Which one would you choose.'" *Id.* at
17 516. The Eight Circuit determined the advertisement was literally
18 false because it "falsely represented that the [drug manufacturer's
19 product] may be indiscriminately substituted" for a competitor's
20 product, *id.*, even though it was not FDA-approved to treat all of
21 the same disorders, physicians needed to monitor patients who
22 switched to the product, and the drug was absorbed differently when
23 taken with a meal. *Id.* at 514. In other words, the drug
24 manufacturer represented that its product "ha[d] certain qualities
25 that it in fact d[id] not actually have." *Id.* at 516 (citing
26 *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 14 (7th Cir.
27 1992)).

28

Page 10 - OPINION AND ORDER

1    In this case, it is important to note, at the outset, that
2    "[l]iteral falsity is a question of fact, and summary judgment
3    should not be granted where a reasonable jury could conclude that
4    a statement is not false." *K&N Eng'g, Inc. v. Spectre Performance*,
5    2011 WL 4387094, at *9 (C.D. Cal. Sept. 20, 2011); *Time Warner*
6    *Cable*, 497 F.3d at 158 ("[O]nly an *unambiguous* message can be
7    literally false. . . . Therefore, if the language or graphic is
8    susceptible to more than one reasonable interpretation, the
9    advertisement cannot be literally false"); *Buetow v. A.L.S.*
10   *Enters., Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011) ("The standard
11   for proving literal falsity is rigorous.")

12   That said, although Fluke's arguments are well-taken,
13   questions of fact remain as to whether FLIR's advertisements are
14   literally false. In reaching this conclusion, I am guided
15   primarily by the following considerations. First, thermal imaging
16   cameras (even higher resolution infrared cameras) produce somewhat
17   cloudy images, (*see, e.g.,* Davis Decl. Ex. 24 at 4), and a vast
18   majority of the images in FLIR's advertisements are extremely
19   small, which means it may not always be practical to use images
20   produced by FLIR's lowest resolution thermal imagers. *See Nikkal*
21   *Indus., Ltd. v. Salton, Inc.*, 735 F. Supp. 1127, 1230 (S.D.N.Y.
22   1990) (mashed potatoes and food shortening used instead of actual
23   ice cream because the heat generated by the lights needed to
24   photograph the product made use of actual ice cream impractical).

25   Second, it is not entirely clear how much of an impact the
26   size, file type, and image editing software utilized had on an
27   image's quality (i.e., perhaps a dramatic reduction in the size of,
28   say, a 320 x 240 image renders it the equivalent clarity of an

Page 11 - OPINION AND ORDER

1   image produced by a lower resolution camera, depending on the
2   circumstances).

3       Third, all of FLIR's advertisements referenced in Fluke's
4   amended memorandum include a specification as to each advertised
5   camera's detector resolution (e.g., the number of pixels that the
6   camera is capable of displaying).

7       Fourth, and finally, based on the visual images and
8   accompanying text in FLIR's advertisements, I cannot say that all
9   reasonable jurors would conclude that the messages conveyed are
10  necessarily and unambiguously false.  There are a few concepts at
11  play here.   First, we have FLIR admitting it put a higher
12  resolution image on the view finder of a lower resolution camera in
13  its print advertising.  The clear suggestion being that the cheaper
14  camera produced the higher resolution image.  However, there are
15  two other significant factors in determining whether the ". . .
16  images, considered in context, necessarily and unambiguously imply
17  a false message."  *CertainTeed*, 2010 WL 2640083, at *10.

18      The first issue is the size of the camera's display depicted
19  in FLIR's advertisement.  If the size of the display on which the
20  higher resolution image was superimposed was the actual size of the
21  camera's display, then perhaps only the pixels of resolution would
22  be involved in the "necessary and unambiguous" message conveyed.
23  When the printed ad's picture of the camera gets reduced or
24  enlarged from the actual display size of the camera, however, the
25  resolution of the printed image can change dramatically.[5]

26

27      [5] The largest image of the three fuses depicted on the FLIR
    i5's LCD screen in the 2008 brochure is about the size of the first
28                                              (continued...)

Page 12 - OPINION AND ORDER

The second issue revolves around the resolution of the print ad itself.  What is the resolution or print density of the print ad and the images in the advertisement?  This too can change the quality of the image superimposed on the view finder of the lower resolution camera.  Since many of the ads are accessed on the Internet, the graphics display of the customer's computer becomes an issue, as does their printer if they print the ad.  The record does not eliminate these issues of fact on the FLIR ads, thus precluding summary judgment for Fluke on this claim.  Accordingly, I deny Fluke's motion for summary judgment on its counterclaim because there is a genuine issue of material fact as to whether FLIR's advertisements are literally false under the applicable law.

### 2.   *Evidentiary Objections*

In its response to Fluke's motion for summary judgment on its counterclaim, FLIR cited reports provided by three expert witnesses: (1) Bruce Silverman, an advertising expert whose testimony was proffered to demonstrate "how customers perceive and respond to images in print and on-line advertising and traditional catalog environment" and whether "FLIR's use of so-called 'cut-and-paste images' in their printed and on-line promotional materials were in any way likely to deceive or confuse potential customers" (Silverman Report ¶ 9); (2) Dr. Robert Madding, a technical industry expert whose testimony was proffered to demonstrate that Fluke has engaged in the same advertising practice that is the subject of its counterclaim against FLIR; and (3) Robert James

---

[5](...continued)
knuckle of my thumb.

Seffrin, an industry expert whose testimony was proffered to demonstrate that "[t]he practice of providing high resolution sample images in descriptive literature is customary within the infrared industry . . . has been around for many years and is well known within the infrared community." (Pl.'s Am. Resp. at 12.)

Fluke challenges the admissibility of these experts' testimony on relevancy grounds and the reliability requirements enunciated in *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 591–99 (1993) (indicating district courts analyzing the admissibility of scientific opinion testimony under Federal Rule of Evidence 702 must ensure that the testimony is based on scientifically valid principles and is relevant to the facts in issue). On summary judgment I need not rule on these objections as I deny the motion without considering any of these three opinions. The question of fact I found exists without considering this testimony. *See Harlan v. Roadtrek Motorhomes, Inc.*, No. 07-cv-0686, 2009 WL 928309, at *6 n.5 (S.D. Cal. Apr. 2, 2009) (same). I expect the same issues will be raised in the parties' *Daubert* motions set for oral argument October 30, 2012, concerning the admissibility of a variety of expert testimony at trial. The lack of a ruling now is no indication of the ruling to expect following the October 30 hearing.

**B.  *Fluke's Motion for Summary Judgment on FLIR's Claims [#178]***

**1.  *Count One (FLIR's False Advertising Claim)***

FLIR's Lanham Act false advertising claim concerns Fluke's dissemination of the drop video. Fluke argues it is entitled to summary judgment on FLIR's Lanham Act false advertising claim for four independent reasons. First, as a matter of law, Fluke argues

Page 14 - OPINION AND ORDER

that the statements complained of are not literally false, nor are they misleading in context.  Second, Fluke argues there is no evidence that a substantial portion of the viewing audience was misled.  Third, Fluke claims that no reasonable juror could find that the challenged statements, even if false or misleading, are material, as they did not influence consumers' purchasing decisions.  Fourth, and finally, Fluke argues that FLIR has not shown that is has been or is likely to be injured as a result of the challenged conduct.

With respect to false comparative advertising, a court's summary judgment analysis largely turns on element one and whether sufficient evidence exists to permit a juror to conclude that an advertisement is literally false.  *See Southland Sod*, 108 F.3d at 1146 (reversing summary judgment where a reasonable juror could conclude advertisements were literally false).  A domino effect occurs when there is a genuine issue of fact as to whether the advertisement is literally false.  A presumption is created in the plaintiff's favor with respect the remaining elements that are typically contested in Lanham Act false advertising cases, thereby precluding the grant of summary judgment in favor of the defendant.[6]  *See Nat'l Prods., Inc. v. Gamber-Johnson LLC*, 699 F. Supp. 2d 1232, 1241 (W.D. Wash. Mar. 16, 2010) (recognizing that a plaintiff is entitled to a presumption of deception, reliance and damage when there are issues of fact as to whether a comparative

---

[6] Often times, the parties in Lanham Act false advertising cases do not dispute element four: whether the defendant caused the false statement to enter interstate commerce.  The same can be said here as well.

Page 15 - OPINION AND ORDER

advertisment is literally false), *aff'd*, 449 F. App'x 638 (9th Cir. Sept. 7, 2011).

### a. The Admissibility of FLIR's Expert Testimony

FLIR argues that a reasonable juror could conclude that the video is literally false. In support of its position, FLIR relies heavily on the opinion of its "drop test expert witness," William Bisenius ("Bisenius"), whose testimony was proffered to demonstrate that there were "numerous problems" with the drop test that rendered the results inconclusive and invalid. Fluke challenges the admissibility of Bisenius' testimony on relevancy grounds and the reliability requirements set forth in *Daubert.*

Bisenius is the president of CertifiGroup Inc. and, according to his "Compliance Research Report," is "considered an International Expert in Product Safety, including Test and Measurement Equipment." (Millimet Decl. Ex. 59 at 1.) Bisenius holds "the rare double NARTE certification of NCE and NCT (Certified Engineer and Technician)." (Millimet Decl. Ex. 59 at 1.) Bisenius graduated from San Jose State University with a bachelor of science in electrical engineering and has over twenty-seven years of experience in compliance testing of products, including over eight years as a senior engineer and engineering manager for the product safety testing and certification organization, Underwriters Laboratories ("UL"). Based on Bisenius' analysis, research, and experience, he concluded: (1) the drop test was not conducted by an independent source; (2) "[n]umerous problems with the testing, including concerns with the test method, test location, test equipment, management of test samples, as well as test interference from parties involved, renders the [drop] test

Page 16 - OPINION AND ORDER

results inconclusive and invalid"; (3) "[e]diting of the video results in a misperception that all imagers other than Fluke's fail with a single drop impact from 2 meters"; and (4) "[m]ultiple statements made by Fluke in text in the video do not appear accurate." (Millimet Decl. Ex. 59 at 1.)

Pursuant to Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. FED. R. EVID. 702.

The Ninth Circuit discussed the requirements for admissibility of an expert's opinion in *Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010). As the Ninth Circuit explained,

> *Daubert* held that Federal Rule of Evidence 702 replaces the old . . . gatekeeping test, [e.g.,] general acceptance in the particular field, with a different test which is, in some respects, more open to opinion evidence. The requirement that the opinion testimony 'assist the trier of fact' 'goes primarily to relevance.' For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion. In sum, the trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand.

Page 17 - OPINION AND ORDER

1  *Primiano*, 598 F.3d at 564 (internal quotation marks and citation
2  omitted).

3      Bisenius' first and fourth opinions are not subjects on which
4  the jury needs help determining the issue.  They are the typical
5  sorts of issues juries decide.  They are just as well equipped to
6  listen to the evidence and decide if Sierra is an independent
7  source and if the embedded statements in the video are true.  There
8  is nothing about the training and experience of Bisenius that
9  renders his opinion helpful to the jury on these issues.  The Court
10 is confident counsel will make the arguments which this proffered
11 testimony constitutes without the witness arguing for them.  I
12 sustain the objection to this proffered testimony.

13      Whether the testing method rendered the test results
14 inconclusive or invalid is a proper subject for expert testimony
15 and that field is within the expertise of Bisenius.  As to
16 Bisenius' second conclusion, Fluke claims it should be excluded on
17 the grounds that (1) Bisenius does not purport to have any
18 understanding -- either through personal experience or acquired
19 knowledge -- about how the thermal imaging camera industry drop
20 tests cameras; (2) Bisenius' opinion fails to tie his opinion to
21 any objective standard; and (3) Bisenius failed to articulate what
22 difference any of the alleged deficiencies made to the drop video.
23 The criticisms Fluke has for his testimony are fertile grounds for
24 cross examination, not exclusion.  The objection to that testimony
25 is overruled.

26      Lastly, whether a video or photo has been edited, enhanced or
27 touched up is something a jury may well be ill-equipped to discern
28

Page 18 - OPINION AND ORDER

depending on the facts.  The objection to this testimony is overruled.

### b.    Could a Reasonable Juror Conclude that the Drop Video is Literally False?

FLIR argues that a reasonable juror could conclude that the video is literally false because the drop test was flawed, and accordingly produced invalid results.  I agree.

Where, as here, the "defendant's ad explicitly or implicitly represents that tests or studies prove its product superior, [the] plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992).  Keeping in mind that a product testing "claim can be literally false even if the cited test or study *does* prove the proposition, if the test was not sufficiently reliable to permit one to conclude with reasonably certainty that the test established the proposition for which it was cited." *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963 (W.D. Wisc. July 14, 2010) (emphasis in the original) (citation and internal quotation marks omitted).[7]

In Bisenius' opinion, there were numerous problems with the drop test that rendered the test results inconclusive and invalid.  For example, Bisenius criticized Defendants for not using or

---

[7]    This Court's reading of *Castrol*, which was relied upon by the Ninth Circuit in *Southland Sod*, is in accordance with the district court's interpretation in *Riddell*.  *See Castrol*, 977 F.2d at 63 ("[P]laintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited. . . . [P]laintiff can meet this burden by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior. . . . [This] standard of course assumes that the tests in question, if reliable, would prove the proposition for which they are cited.")

Page 19 – OPINION AND ORDER

consulting any test standard in developing the test methodology. He also opined that the test results could have been impacted by irregularities with the drop test stand, such as its quality, inability to be calibrated, and "string jerk release." With respect to the testing environment, Bisenius criticized Defendants' drop test because the floor was not level and had numerous imperfections; the drop stand was too close to the wall; and the test was performed outdoors with uncontrolled and changing weather conditions. Furthermore, Bisenius observed that the test stand could be seen rocking during the test as a result of poor construction and the Fluke Ti32 was "not tested in other sitting positions on the drop platform," despite Fluke's competitor's thermal imagers being "put into various and increasingly more precarious positions on the platform." (Millimet Decl. Ex. 59 at 5.)

    In short, it is for the jury to decide whether the drop test did, or did not, establish the proposition for which it was cited in light of the criticisms leveled at the test. Having raised a question of fact on the first element, FLIR is entitled to a presumption that there are questions of fact on deception (element two), materiality (element three), and damage (element five). The fourth element is not challenged by Fluke. Therefore, Fluke's motion for summary judgment is denied on this claim.

*2.   Count Two (Trade Libel/ Commercial Disparagement)*

    To prevail on a state law trade libel claim, it must be established that the defendant published false allegations about the plaintiff with malice, and that the plaintiff suffered special damages or pecuniary harm as a result of the publication. *See*

*Soloflex, Inc. v. NordicTrack, Inc.*, Civ. No. 93-545-JE, 1994 WL 568401, at *13 (D. Or. Feb. 11, 1994).

Fluke's argument regarding FLIR's trade libel/ commercial disparagement claim is fourfold. First, Fluke argues that the drop video does not contain any false statements. Second, Fluke argues that, even if FLIR could show the drop video contains a false statement, not one of the allegedly false statements is regarding FLIR's products (e.g., that "[a]n independent 3rd party performed and filmed this drop test video"; "Fluke Ti32 — 17 Drops and counting . . . The ONLY rugged thermal imager . . . Why waste money on tools that break?") Third, Fluke claims that there simply is no evidence that it acted with malice by publishing the drop video. Finally, Fluke claims that FLIR cannot show it incurred any special damages as a result of the publication of the drop video.

FLIR counters by arguing that summary judgment is inappropriate because a reasonable juror could conclude that the video, in its full context, falsely represents the actual results of the drop test; Fluke acted with malice in publishing the video; and FLIR suffered special damages or pecuniary harm as a result of the video.

Fluke submits evidence it contends supports that it acted with a legitimate business motive, not purely out of malice. Fluke argues a series of emails exchanged in March 2010 by several high-ranking employees of FLIR suggests FLIR perceived a competitive motivation for Fluke. For example, on March 18, 2010, FLIR's vice president of thermography sales, Thomas Scanlon ("Scanlon"), emailed his co-workers, in essence acknowledging the legitimacy of Fluke's marketing strategy:

Page 21 - OPINION AND ORDER

I've always felt the drop test exposes a vulnerability in
our camera design and I have been surprised it has taken
Fluke this long to try to expose this weakness [in our
cameras]. I would love to do a drop test from 2.5 meters
and follow that up with a drop from a diving platform
into a swimming pool. . . . Fluke is trying to play
hardball and I would love to make them regret they ever
made this video.

(Mehrbani Decl. Ex. 9 at 1.)  Scanlon went on to state:

I think we would have a hard time proving the video was
deceptive.  Our cameras are not designed to drop from 2
meters and the result portrayed in the video is not
completely unpredictable. . . . We will soon be in a
position to introduce cameras to the market that are more
rugged than the Fluke cameras portrayed in the video.
They may be actually setting themselves up for a very
dangerous exposure on the rugged cameras decision.

(Mehrbani Decl Ex. 8 at 1.)

That same day, FLIR's general manager, Rickard Lindvall
("Lindvall"), responded to Scanlon's emails, stating: "As you know
we have focus[ed] on this [vulnerability in our camera design] for
our [up]coming volume cameras. . . . [I]t's just about deciding that
this is important. As we have.  It will take some time before our
complete volume line can do [a] 2m drop[.] . . . [But] we have
closed the gap[.]"  (Mehrbani Decl. Ex. 9 at 1.)  FLIR's director
of sales in the United States, Brent Lammert ("Lammert"), suggested
that a "2+ meter drop need[ed] to be in [FLIR's] next product
launch." (Mehrbani Ex. 8 at 4.)  However, Frechette felt it was more
important to preserve the aesthetics of FLIR's cameras: "Not sure
I agree on a 2m drop . . . [our camera would] have to be wrapped in
plastic like the [F]luke [camera]. . . looks like crap." (Mehrbani
Ex. 8 at 3.)

The problem with this evidence is its origin in FLIR employee
statements and its focus on FLIR's thoughts and perceptions.  It
says nothing directly about Fluke's motivation for the drop test or

Page 22 - OPINION AND ORDER

the ad.   Evidence pertaining to Fluke's employee's statements
regarding the drop video are revealing in this regard.   For example,
in August 2009, an email with the subject line "Beat FLIR – input
needed" began to circulate among several high-ranking Fluke
employees.   In that chain of emails, Fluke employee Kirsten Paust
stated:

> Guys – we have to get a document together ASAP that shows
> the [Fluke] Ti32 and where we win against FLIR – straight
> up.   This has to be a priority. . .   We are missing a
> real opportunity here to communicate our differentiation
> to the marketplace.   We [only rely on the fact that] we
> have interchangeable lenses – we have so much more than
> that

(Millimet Decl. Ex. 18 at 1.)   Fluke employee Jay Choi offered one
of those advantages: "An imager built for the industrial environment
– only imager with 2m drop test and best in class 2 year warranty.
Fewer moving parts (no weak articulating lens joint and motorized
focus) that will break down."   (Millimet Decl. Ex. 18 at 4.)
Similarly, Fluke employee Michael Stuart suggested emphasizing the
"ruggedness" of Fluke Ti32 compared to FLIR's cameras.   (Millimet
Decl. Ex. 18 at 6.)   This evidence reveals a legitimate competitive
motivation.

     The parties discuss how to define malicious for purposes of the
tort of trade libel under Oregon law.   They suggest the court should
look to the law of defamation.   In a defamation action under Oregon
law, malice may be established by evidence that a statement was
published: (1) "with knowledge that it was false or with reckless
disregard of whether it was false or not," (2) "with [a] high degree
of awareness of [its] probable falsity;" or (3) when "defendant in
fact entertained serious doubts as to the truth of [its]
publication."   *McNabb v. Oregonian Pub. Co.*, 69 Or. App. 136, 140

(1984); *Fodor v. Leeman*, 41 P.3d 446, 448-49 (2002).   *Fodor* presented a question of the sufficiency of the evidence that demonstrated the defendant's malice.   The evidence suggested the defendant "could have conducted a more thorough investigation to determine whether the statements that he made about plaintiff and his article were true."   *Id.* at 449.   The Oregon Court of Appeals held such "evidence is insufficient to establish actual malice," *id.*, and affirmed the trial court's summary judgment dismissing the defamation claim based on this evidence.   *Id.*   FLIR's record at its best suggests no more than that Fluke could have been more rigorous in conducting its drop test depicted in the video.   That is not enough under Oregon law to establish malice.

Further, to the extent FLIR seeks to establish that Fluke's motivation for production of the drop test video was the malicious injury of FLIR, how dominant, if at all, must Fluke's purpose be for FLIR to avoid summary judgment? The tort of trade disparagement has as an element that the false statement be made with malice.   Must malice be the only reason for the statement's publication, the primary reason, or any part of the reason the statement was made? The Oregon case law is sparse on trade libel.   It does not directly address this issue.   I note that malice has been described by the Oregon Supreme court in a case not involving trade libel as "the intention to injure another without just cause or excuse." *Heitkemper v. Cent. Labor Council*, 192 P. 765, 772 (1920) (citation omitted).   This will usually depend on the relationship between the parties and the factual background.   As one court observed, the intent to injure in a situation involving competitors can be negated by a showing that the acts were done for professional or competitive

Page 24 – OPINION AND ORDER

1    advantage.    *Bro-Tech Corp. V. Thermax*, Inc., 651 F. Supp. 2d 378,
2    419 (E.D. Pa. 2009).

3    I conclude that the law in Oregon on this issue is that to
4    recover for trade libel a plaintiff must establish that the
5    defendant's publication of the false statement was done with a
6    primary purpose of maliciously injuring the plaintiff.  To require
7    it to be the sole purpose is too stringent a standard as it enables
8    the defendant to escape responsibility for any trumped up secondary
9    purpose for the statement's publication.  Likewise, to allow the
10    recovery for trade libel upon the showing of any desire to reduce
11    the business of the plaintiff, is too liberal a standard.  It
12    ignores the fact the cases recognize that any time a person promotes
13    his own product in competition, if the promotion is successful, it
14    necessarily is to the detriment of the defendant's competitors.  I
15    conclude that the Oregon court's inclusion of maliciousness in the
16    elements of the tort for purposes of establishing *any* liability at
17    all suggests a desire for more culpability than this low threshold
18    to support the tort.  Therefore, I conclude that FLIR must raise a
19    material issue of fact that would allow a reasonable juror to
20    conclude that the primary purpose of the drop test video was to
21    maliciously injure FLIR.

22    I do not believe this record supports such a finding.  The
23    evidence that Fluke developed a line of cameras that was rugged
24    enough to better survive a drop from two meters, and saw that as a
25    marketing advantage of its products that was worthy of promotion,
26    suggests it had legitimate reasons to produce the drop test video.
27    Whatever adverse effects the video might have on Fluke's competitors
28    were sufficiently secondary to this legitimate purpose on this

Page 25 - OPINION AND ORDER

record that Fluke is entitled to summary judgment on this claim. The incidental harm to a competitor that is always involved in legitimate business competition is not compensable as trade libel upon a showing of a false statement being involved under Oregon law, unless the plaintiff can show that the primary motivation of the false statement was the injury of the plaintiff.

**3.    *Civil Conspiracy)***

In Count Four, FLIR alleges that Fluke and Sierra conspired to disparage FLIR and its products.   Under Oregon law, "[a] civil conspiracy consists of (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as a result of the overt act or acts." *Morasch v. Hood*, 232 Or. App. 392, 402 (2009).  But civil conspiracy is not "a separate tort for which damages may be recovered; rather it is a way in which a person may become jointly liable for another's tortious conduct." *Id.* Based on this understanding of civil conspiracy, Count Four is dependent upon a valid underlying predicate tort (FLIR's state law trade libel claim) and satisfaction of the aforementioned elements. As no predicate tort remains to support FLIR's civil conspiracy claim, Fluke is entitled to summary judgment on Count Four. *Cf.* *Pardue v. Gray*, 136 F. App'x 529, 533 (3d Cir. June 27, 2005) ("A cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability.")[8]

---

[8] The Lanham Act false advertising claim will not support the civil conspiracy claim either.  *See* Opinion and Order, *infra*, at 32-37.

Page 26 - OPINION AND ORDER

Even assuming, arguendo, that FLIR's trade libel/ commercial disparagement claim survived summary judgment, I would still conclude that Defendants are entitled to summary judgment as to Count Four.  As with trade libel, to be actionable, "the *primary purpose* of a civil conspiracy must be to cause injury to another." *Yanney v. Koehler*, 147 Or. App. 269, 275 (1997) (emphasis added). In this case, there is no genuine issue of material fact because the record is devoid of any evidence suggesting a conspiracy with the *primary purpose* of causing harm to FLIR.  Instead, in hiring Sierra to create and disseminate a promotional video, the only harm Fluke may have intended to cause FLIR "was the incidental harm to a competitor that is necessarily part of all legitimate business competition." *BCD LLC v. BMW Mfg. Co., LLC*, 360 F. App'x 428, 437 (4th Cir. 2010); *Bliss v. S. Pac. Co.*, 212 Or. 634, 641 (1958) ("So long as the object of the combination is [t]o further its own fair interest or advantage, and not the injury of another, its members are not liable for any injury which is merely incidental.")

To that end, the Fourth Circuit's decisions in *BCD LLC* and *Waldrep Bros. Beauty Supply Inc. v. Wynn Beauty Supply*, 992 F.2d 59 (4th Cir. 1993), are instructive.[9]  In *BCD LLC*, Clemson University and BMW Manufacturing Co., LLC ("BMW") had explored possible educational initiatives on which they could collaborate, including a wind tunnel that would cater to the racing industry.  *BCD LLC*, 360

---

[9] South Carolina law regarding civil conspiracy is quite similar to that of Oregon.  *See Lee v. Chesterfield Gen. Hosp., Inc.*, 289 S.C. 6, 344 S.E.2d 379, 382 (1986) (Under South Carolina law, "[a] civil conspiracy . . . consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damage.")

Page 27 - OPINION AND ORDER

F. App'x at 431.  BMW was not interested in funding a wind tunnel, but proposed an alternative plan of partnering with Clemson to establish a graduate engineering center ("GEC") as part of Clemson's International Center for Automotive Research.  *Id.* at 431-32.  One year later, in April 2002, a developer, Clifford Rosen, and Clemson entered into a terminable-at-will agreement in order to lay the foundation for the development of a motorsports facility with a wind tunnel.  *Id.*

After BMW and Clemson drafted a "Memorandum of Expectations" with respect to the GEC in July 2002, Rosen began to urge Clemson and BMW to consider using property he owned as the potential site. *Id.* at 432.  However, BMW emphasized the need to distinguish the state-funded GEC from the privately-funded facility Rosen was developing, and Clemson declined to commit itself to using Rosen's property.  *Id.*  Rosen interpreted this as BMW attempting "to kill his project."  *Id.* at 432-33.

In January 2003, Rosen sent a letter to Clemson expressing concerns about the wind tunnel project.  *Id.* at 433.  Despite Rosen following up with a letter reiterating his commitment to the project, Clemson's President responded on March 12, 2003, informing Rosen that his 2002 agreement constituted a mere letter of intent that was terminable at will.  *Id.*  In October 2003, Rosen and Clemson agreed to an entirely different agreement, which Rosen characterized as an attempt to mitigate the damage caused BMW's actions.  *Id.*  Rosen then brought a civil conspiracy action against BMW in the United States District Court for the District of South Carolina.  *Id.*  The district court granted BMW's motion for summary judgment and Rosen filed a timely appeal.  *Id.*

Page 28 - OPINION AND ORDER

1    The Fourth Circuit affirmed the district court's holding,

2    stating:

> In this case, there is no genuine issue of material fact
> because the record is devoid of any evidence suggesting
> a conspiracy.  Indeed, no facts have been presented that
> could lead a court to conclude that BMW's objective was
> to injure Rosen's business.  Although Rosen claims that
> there were meetings, telephone calls, and emails
> exchanged between BMW, [Clemson's subsidiary], and
> [Clemson's subsidiary]'s attorneys plotting ways to
> leverage him to give up his property and contract rights,
> such claims are insufficient.  Rosen has not provided a
> scintilla of evidence that would suggest that BMW
> possessed the requisite motive to injure.  Rather, the
> record indicates that BMW was motivated by its desire to
> establish the GEC, which in and of itself does not imply
> an explicit desire to damage Rosen's business.  The only
> harm that BMW may have intended to cause Rosen was the
> incidental harm to a competitor that is necessarily part
> of all legitimate business competition.  That increased
> benefits for one entity may come at the expense of a
> competing entity is merely a fact of life in a market
> economy.

14   *Id.* at 437.

15   In *Waldrep*, a beauty salon products distributor (Waldrep)

16   brought suit against a competitor (Wynn) after manufacturers (Redken

17   and Sebastian) terminated Waldrep's at-will distributorship contract

18   in favor of Wynn.  *Waldrep*, 992 F.2d at 60-61.  Originally, Wynn

19   intended to purchase Waldrep and had discussed the possible

20   acquisition and assignment of Waldrep's distribution agreements with

21   Redken and Sebastian.  *Id.* at 61.  Not long after the negotiations

22   reached an impasse, Redken and Sebastian notified Waldrep of the

23   termination of its distribution agreements.  *Id.*  A lawsuit

24   followed, with Waldrep alleging that Wynn engaged in a civil

25   conspiracy to destroy Waldrep's business.  *Id.* at 60.  The jury

26   found for Waldrep, and the district court denied Wynn's motion for

27   judgment as a matter of law.  *Id.*  "Finding no evidence that Wynn

28   did anything other than compete on the merits with Waldrep," the

Page 29 - OPINION AND ORDER

Fourth Circuit reversed the judgment of the district court. *Id.* In so holding, the Fourth Circuit stated:

> Business competition produces success and failure; over time, only firms that satisfy their customers will survive. In this diversity case, plaintiff seeks to erect the tort law of South Carolina as a barrier to the forces of market competition. . . . The evidence in this case . . . demonstrated that Wynn's object was simply to make money[.] . . . The only harm that Wynn intended to cause Waldrep was the incidental harm to competitors that is necessarily part of all legitimate business competition. To be sure, Waldrep was harmed by the loss of business, but those losses must be considered against the gain to Redken and Sebastian from having a more energetic and efficient distributor. That increased profits for one enterprise may come at the expense of a competitor is a fact of life in a market economy. We cannot, however, simultaneously encourage competitors to compete and hold them liable in tort whenever they do so successfully.

*Id.* at 61, 63.

Much the same can be said here. The evidence in this case demonstrates that Fluke's *primary* objective was simply to make money through legitimate competition. The evidence of this includes(1) the attempts to conceal FLIR's logo in the video; (2) the inclusion of another competitor's camera and drops where no visible damage results to FLIR's cameras; and (3) the emphasis being placed primarily on the structural integrity of the Fluke Ti32. "The purpose of the video was to demonstrate Fluke's unique ruggedness compared to competitive cameras in the market at the time," (Stuart Dep. 23:14-16, Dec. 6, 2011), but Fluke nevertheless instructed Sierra's president, Dan Cardenas ("Cardenas"), to treat all of the thermal imagers tested "exactly the same" in an attempt to produce legitimate results. (Cardenas Dep. 13:16-16:18, Jan. 20, 2012.)

Perhaps most tellingly, Scanlon predicted that Fluke would attempt to exploit, or make money off of, "this competitive

Page 30 - OPINION AND ORDER

advantage" before the drop video was ever created.  Specifically, on December 1, 2008, Scanlon was informed that FLIR lost a sale (15 units at $3,700 each) because the customer preferred the Fluke camera's "perceived ruggedness" and ability to withstand a drop test.  (Mehrbani Decl. Ex. 9 at 3.)  The very next day, Scanlon emailed FLIR's vice president of product management, Torbjorn Hamrelius, stating:

> I am surprised Fluke has not made a bigger deal out of the drop test, but our free pass on this competitive advantage may be coming to an end. . . . I would not be surprised to see them run hard with this design advantage.  We should carefully consider a drop test promise on our next camera design and explore a way to make our current I-series products more rugged.

(Mehrbani Decl. Ex. 9 at 3.)  In August 2009, Scanlon's prediction came to fruition as ideas began to circulate among employees of Fluke as to how it could improve its marketing in order to effectively compete with FLIR.  Chief among them being to emphasize the Fluke Ti32's ruggedness and ability to withstand a two meter drop.  (Millimet Decl. Ex. 18 at 2-6.)  The following month, Fluke hired Sierra to produce the drop video.

In summary, there is no genuine issue of material fact as to whether Fluke engaged in a civil conspiracy with the *primary purpose* of causing injury to FLIR.  Fluke would therefore be entitled to summary judgment on Count Four on this ground as well.

### C. *Sierra's Motion for Summary Judgment [#175]*

Sierra moves the Court for an order granting summary judgment on the only remaining claims against it: Counts One (false advertising under the Lanham Act), Two (trade libel/ commercial disparagement), Four (civil conspiracy) and Five (aiding and assisting) of FLIR's first amended complaint.

Page 31 - OPINION AND ORDER

1  **1.   *Count One (False Advertising)***

2    With respect to Count One, Sierra's argument is twofold. First,

3  Sierra argues that FLIR does not have standing to prosecute its

4  Lanham Act false advertising claim against Sierra in this action

5  because there is no dispute as to the material fact that Sierra does

6  not *compete* against FLIR in the market for thermal imaging cameras.

7  Second, even assuming FLIR had standing to pursue its false

8  advertising claim, Sierra claims it would still be entitled to

9  summary judgment because there is no genuine issue of fact as to

10  whether the Lanham Act was violated.

11    The Ninth Circuit set out the test for Lanham Act standing in

12  *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,

13  407 F.3d 1027 (9th Cir. 2005), where the court held that "a

14  plaintiff must show: (1) a commercial injury based upon a

15  misrepresentation about a product; and (2) that the injury is

16  'competitive,' or harmful to the plaintiff's ability to compete with

17  the defendant." *Id.* at 1037.  In the context of a Lanham Act false

18  advertising claim, standing exists "where misrepresentations about

19  product quality could theoretically draw a consumer away from [a]

20  competitor's product." *Healthport Corp. v. Tanita Corp. of Am.*, 563

21  F. Supp. 2d 1169, 1177 (D. Or. 2008) (citing *Waits v. Frito-Lay,*

22  *Inc.*, 173 F.3d 725, 734 (9th Cir. 1992)).

23    Sierra asserts that FLIR fails the competitive prong of *Jack*

24  *Russell* because FLIR and Sierra are not competitors:  FLIR

25  manufactures and sells infrared cameras and thermal imaging

26  equipment, while Sierra is a media marketing company that "does not

27  manufacture, produce, sell, or distribute thermal imagers, or any

28  other product."  (Sierra's Mem. Supp. at 6.)  In support of its

Page 32 – OPINION AND ORDER

position, Sierra relies primarily on *Halicki v. United Artists Commc'ns*, 812 F.2d 1213 (9th Cir. 1995) and *Fuller Bros., Inc. v. Int'l Mktg., Inc.*, 870 F. Supp. 299 (D. Or. 1994).

In *Halicki*, the plaintiff produced "The Junkman," a film designed to appeal to teenagers and young adults. *Halicki*, 812 F.2d at 1213.    Despite the film's commercial success being closely connected with a PG rating, the distributors advertised the movie as rated R, indicating that the film was unsuitable for children and young adults. *Id.*    In rejecting the movie producer's contention that to state a Lanham Act claim, all he need do was show that the distributors "made a false representation about his film and that he was injured by the representation," the Ninth Circuit emphasized that the injury sustained must be one the Lanham Act is intended to prevent. *Id.* at 1214.    Thus, the misrepresentation as to The Junkman's rating was not actionable under the Lanham inasmuch as the movie producer had not been injured by a competitor. *Id.* at 1214-15.

Similarly, in *Fuller*, the manufacturer of "Tire Life," a liquid formula that extends the life of truck tires, brought a Lanham Act action against the manufacturer of "Equal," a formula that reduces vibration and eliminates radial and lateral force variation when placed inside the tires. *Fuller*, 870 F. Supp. at 301.    In evaluating whether Tire Life's manufacturer had standing to bring a claim for false advertising, this court noted that competitors are "[p]ersons endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than his rival." *Id.* at 303 (quoting *Black's Law Dictionary* 257 (5th ed. 1979)).    Although the two formulas were

Page 33 - OPINION AND ORDER

marketed to many of the same customers, *Fuller* determined that Tire Life's manufacturer lacked Lanham Act standing because the two manufacturers were not competitors:

> E[qual] is a tire balancing product. T[ire] L[ife] is not a tire balancing product. If this court holds that [Tire Life's manufacturer] has sta[nding] . . . under the Lanham Act, the Lanham Act becomes a federal statute creating the tort of misrepresentation, actionable as to any goods or services in commerce affected by the misrepresentation.

*Fuller*, 870 F. Supp. at 303 (quoting *Halicki*, 812 F.2d at 1214).

In response, FLIR argues that the case law on which Sierra relies does not concern a co-defendant that is jointly and severally liable with the plaintiff's competitor for false advertising, and therefore is inapposite. According to FLIR, courts that have considered analogous situations -- where the plaintiff sues its competitor and a marketing firm that helped create and disseminate false advertisements -- have found that a competitor's marketing firm can be held liable under the Lanham Act. In support of this proposition, FLIR relies primarily on Second Circuit case law, such as *Grant Airmass Corp. v. Gaymar Indus., Inc.*, 645 F. Supp. 1507 (S.D.N.Y. 1986).

In *Grant*, the plaintiff and defendant were competitors in the field of pressure sore prevention products (e.g., mattresses and pads that prevent bedsores). *Grant*, 645 F. Supp. at 1509. It was alleged that Gaymar commissioned its co-defendant in the case, a research firm, to undertake a false and misleading comparative study of pressure sore prevention products. *Id.* The research firm moved for summary judgment, arguing that, as a non-competitor in the sale of pressure sore prevention products, it could not be held liable under the Lanham Act. *Id.* at 1511. *Grant* rejected this argument

Page 34 - OPINION AND ORDER

and held that the plaintiff was "entitled to frame a Lanham Act claim against all those allegedly responsible for falsely describing and placing in commerce the advertised goods." *Id*.    The research firm's status as a non-competitor therefore did not require dismissal of the false advertising claim against it. *Id*.

Sierra contends that FLIR's reliance on *Grant* is misplaced and tantamount to ignoring Ninth Circuit precedent in favor of the Second Circuit's directly conflicting standard.    I agree.    The Seventh, Ninth, and Tenth Circuit have adopted the so-called categorical approach, wherein the plaintiff must be in "actual" or "direct" competition with the defendant and assert a competitive injury to establish prudential standing.    *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1164-65 (11th Cir. 2007).    By contrast, in the First and Second Circuits, the dispositive issue is not the degree of "competition," but whether the plaintiff has a "reasonable interest" to be protected against the type of harm that the Lanham Act is intended to prevent.    *Id*. at 1165.

Indeed, it is beyond question that the Second and Ninth Circuits analyze the standing of commercial plaintiffs by applying differing standards:

> The strongest application is the categorical approach utilized by the Seventh, Ninth, and Tenth Circuits. . . . Our test for standing has been called the 'reasonable interest' approach.    Under this rubric, in order to establish standing under the Lanham Act, a plaintiff must demonstrate (1) a reasonable interest to be protected against the alleged false advertising and (2) a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising.

*Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 111-13 (2d Cir. 2010).    As opposed to the categorical approach, the sine qua

Page 35 - OPINION AND ORDER

1    non of standing under the "reasonable interest" approach is not

2    whether the plaintiff and defendant are in competition. *Id.* at 113.

3         It is too well settled to require citation of authority that

4    this court is bound by circuit precedent.   The dispositive issue

5    here, then, is the degree of competition because the Ninth Circuit

6    utilizes the so-called categorical approach to determine standing.

7    Because Sierra and FLIR are not competitors, FLIR lacks standing to

8    sue Sierra for false advertising under the Lanham Act.   Sierra is

9    therefore entitled to summary judgment on Count One.

10   ***2.    Counts Two***

11        Sierra is entitled to summary judgment for all the reasons

12   discussed above with respect to Fluke, Opinion and Order, *supra*, at

13   20-26.

14   ***3.    Count Four***

15        With respect to Count Four, as discussed above, there is no

16   genuine issue of material fact as to whether Fluke published false

17   allegations about FLIR with malice, nor is there a genuine issue of

18   fact as to whether Fluke engaged in a civil conspiracy with the

19   primary purpose of causing injury to FLIR.   This eliminates trade

20   libel as the tort to support a civil conspiracy.

21        FLIR lacks standing to sue Sierra for false advertising under

22   the Lanham Act, as discussed above.   This leaves no underlying claim

23   for Sierra and Fluke to have conspired to commit.   Thus, I grant

24   Sierra's motion for summary judgment on Count Four.   *See Bliss*, 212

25   Or. at 642 (explaining that it takes two to conspire, and if one

26   defendant is not liable for conspiracy, the other defendant "is

27   likewise exonerated as a conspirator[.]"); *US West, Inc. v. Business*

28   *Discount Plan, Inc.*, 196 F.R.D. 576, 590-91 (D. Colo. 2000) (finding

Page 36 - OPINION AND ORDER

1  that a telephone company lacked standing to a bring false

2  advertising claim under the Lanham Act against a telemarketer and

3  a verification services company as they were not competitors of the

4  telephone company, and accordingly granting summary judgment in

5  their favor despite allegations that they conspired with a

6  competitor of the telephone company); *see also Pardue*, 136 F. App'x

7  at 533 ("A cause of action for civil conspiracy requires a separate

8  underlying tort as a predicate for liability.")

9  **4.   *Count Five***

10    Turning to the merits of Count Five, it is FLIR's contention

11  that Sierra aided and assisted Fluke in the commission of the tort

12  of trade libel.  Under Oregon law, aiding and assisting, like civil

13  conspiracy, is not a separate tort for which damages may be

14  recovered: "[N]either 'conspiracy' nor 'aid and assist' is a

15  separate theory of recovery.  Rather, conspiracy to commit or aiding

16  and assisting in the commission of a tort are two of several ways

17  in which a person may become jointly liable for another's tortious

18  conduct." *Granewich v. Harding*, 329 Or. 47, 53 (1999) (internal

19  citations omitted).  Because I have determined that Fluke and Sierra

20  are entitled to summary judgment on FLIR's state law trade libel

21  claim (the predicate underlying tort), I grant Sierra's motion for

22  summary judgment on Count Five.  *Cf. Yadanpanah v. Sacramento Valley*

23  *Mortg. Group*, 2009 WL 4573381, at *5 (N.D. Cal. Dec. 1, 2009)

24  (explaining that "a defendant's liability under an aiding and

25  abetting theory is dependent upon the commission of an underlying

26  tort.")

27  ///

28  ///

Page 37 - OPINION AND ORDER

1  **5.  *Evidentiary Objections***

2       In its reply memorandum, Sierra argued that "FLIR's newly

3  produced evidence of injury" on FLIR's Count One (e.g., declarations

4  from two FLIR employees) and its expert William Bisenius' opinions

5  are inadmissible. (Sierra's Reply at 22.) Upon review, I overrule

6  Sierra's objections as moot because the evidence moved against did

7  not impact my determination of the merits of Sierra's motion for

8  summary judgment. The "injury" element is not the basis of my

9  decision. *See Harlan*, 2009 WL 928309, at *6 n.5 (same).

10              **D.  *FLIR's Motion for Summary Judgment [#176]***

11       FLIR claims it is entitled to summary judgment on Fluke's

12  trademark infringement and unfair competition claims based on its

13  purported IR Fusion trademark because Fluke's trademark is invalid

14  and such claims are barred by the doctrine of laches. For those and

15  other reasons, FLIR also claims it entitled to summary judgment on

16  Fluke's "other" false advertising counterclaims based on (1) FLIR's

17  use of the terms IR Fusion and fusion in its advertisements; and (2)

18  two FLIR PowerPoint presentations and two similar advertisement, the

19  "banana advertisment" and the "12 Things" promotional literature.

20  **1.  *The Validity of Fluke's IR Fusion Trademark***

21       Generally, "[t]he more likely a mark is to be remembered and

22  associated in the public mind with the mark's owner, the greater

23  protection the mark is accorded by trademark laws." *GoTo.com, Inc.*

24  *v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). The

25  strength of a mark is evaluated conceptually and commercially. *Id.*

26  A mark's conceptual strength depends, in large part, on its

27  connection to the good or service to which it refers. *Fortune*

28  *Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618

F.3d 1025, 1032-33 (9th Cir. 2010).    "The less obvious the connection, the stronger the mark, and vice versa." *Id.* at 1033.

From weakest to strongest, marks are categorized as: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).    Mindful of the wisdom embodied in "the well-established principle that [due to] the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena," *Fortune Dynamic*, 618 F.3d at 1031 (citation and quotation marks omitted; alteration deleted), I conclude there is a genuine issue of fact as to which category Fluke's IR Fusion mark fits within.    *See id.* at 1034 (stating that which category a mark belongs in is a question of fact, and accordingly leaving it to the jury to decide whether a mark was descriptive or suggestive due to the intuitive nature of such an inquiry); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 840 (9th Cir. 2001) ("Whether a mark is generic is a question of fact"); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985) (en banc) ("[T]he question of secondary meaning is one of fact.")

Suggestive arbitrary, and fanciful marks are considered inherently distinctive and are automatically entitled to protection because they naturally serve to identify a particular source of a product. *Yellow Cab*, 419 F.3d at 927.    Descriptive marks "define a particular characteristic of the product in a way that does not require any exercise of the imagination*."*    *Id*.    Such a mark can receive trademark protection if it has acquired distinctiveness by establishing "secondary meaning" in the marketplace.    *Id.*    Generic

Page 39 - OPINION AND ORDER

marks, on the other hand, "give the general name of the product; they embrace an entire class of products." *Id.* (quoting *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir.1998)). "Generic marks are not capable of receiving protection because they identify the product, rather than the product's source." *Yellow Cab*, 419 F.3d at 927 (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005)).

In the present case, although Fluke's IR Fusion trademark has been federally registered, FLIR asserts that the terms "IR Fusion" and "fusion" are either generic or descriptive without acquired secondary meaning, and therefore not entitled to trademark protection. According to Fluke, however, its IR Fusion mark is suggestive, and therefore afforded protection without proof of secondary meaning.

I conclude there is a genuine issue of material fact as to whether Fluke's IR Fusion mark is suggestive or descriptive. Setting aside the fact "[t]he line between descriptive and suggestive marks in nearly incapable of precise description," *Fortune Dynamic*, 618 F.3d at 1033, suggestive marks typically do not describe the product's feature but suggest them, *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 632 (9th Cir. 2005), while "[d]escriptive terms directly describe the quality or features of the product." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 n.19 (9th Cir. 1999). Arguably, the IR Fusion mark does the latter insofar as it describes a feature of Fluke's thermal imager: its ability to blend thermal and visible light images.

Page 40 - OPINION AND ORDER

Nevertheless, "a suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1081 (9th Cir. 2005). An otherwise inherently weak mark can be strengthened by, among other things, extensive advertising, length of exclusive use, public recognition, and the success of the mark's holder. *See id.* (collecting cases). Here, Fluke has put forth evidence indicating its IR Fusion mark has been extensively advertised ($25.2 million since 2005) in its print media (brochures, technical data sheets, catalogues, direct mail), Internet media (website pages and videos, paid search), and at live events (seminars, technology forums, trade shows).[10] Whatever its ultimate force, this evidence is sufficient to make the categorization and strength of the IR Fusion mark a question for the jury. *See Fortune Dynamic*, 618 F.3d at 1034-35 (reaching a similar conclusion); *see also E. & J. Gallo*, 967 F.2d at 1291 (explaining that the strength of a mark is determined by its placement on the continuum of marks: generic, descriptive, suggestive, arbitrary, or fanciful).

A genuine issue of material fact also exists with respect to whether Fluke's IR Fusion mark is generic. "[A] generic term is the name of the product or service itself -- what the product is, and as such . . . the very antithesis of a mark." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999) (citation and quotation marks omitted; alteration deleted). Generic terms describe the "product in its entirety." *Surfvivor*, 406 F.3d at 632. "Examples include 'Liquid controls' for

---

[10] "Paid search" refers to the marketing practice of gaining traffic by buying ads on search engines.

equipment that dispenses liquid, or 'Multistate Bar Examination' for a bar examination that may be taken across multiple states." *Id.* Viewing the evidence in the light most favorable to Fluke, a reasonable jury could conclude that IR Fusion does not state the general name of Fluke's product -- a thermal imaging camera -- and therefore does not fit within the generic category. *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 n.2 (9th Cir. 2002) ("At the other end of the spectrum, 'ENTREPRENEUR' does not state the general name of EMI's product -- a magazine -- and therefore does not fit within the generic category.")

In sum, whether Fluke's IR Fusion mark is generic, descriptive or suggestive is a determination for the jury. FLIR's motion for summary judgment is therefore denied on this ground.

### 2.   The Doctrine of Laches

FLIR argues that Fluke's trademark and unfair competition claims are barred by laches. Laches is an equitable defense to Lanham Act claims that "embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights." *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.,* 559 F.3d 985, 989-90 (9th Cir. 2009). It is well settled that laches is a valid defense to Lanham act claims. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). For guidance, the Court looks to the 2-year statute of limitations for fraud claims by analogy. *adidas America, Inc. v. Payless Shoesource, Inc.*, 540 F. Supp. 2d 1176, 1180 n.1 (D. Or. 2008); *Johannsen v. Brown*, 797 F. Supp. 835, 839-40 (D. Or. 1992) ("This court agrees with those decisions which have found that claims

Page 42 - OPINION AND ORDER

1  brought under . . . the Lanham Act are most comparable to claims
2  brought for fraud.") "If the plaintiff filed suit within the
3  analogous limitations period, the strong presumption is that laches
4  is inapplicable." *Jarrow*, 304 F.3d 829 at 835. "However, if suit
5  is filed outside of the analogous limitations period, courts often
6  have presumed that laches is applicable." *Id.* at 836. The test for
7  laches is a two-part inquiry: first, did the plaintiff unreasonably
8  delay in filing suit; and second, was the defendant prejudiced by
9  the delay. *Internet Specialties*, 559 F.3d at 990.

10      The laches period starts when the party "knew or should have
11 known about its potential cause of action." *Internet Specialties,*
12 559 F.3d at 990. The following timeline of events related to FLIR's
13 laches defense is undisputed. On April 15, 2008, Fluke's counsel,
14 Heidi Sachs ("Sachs"), sent a cease-and-desist letter to FLIR's
15 general counsel, William Davis ("Davis"), stating:

16      It has come to our attention that F[LIR] recently
17      commenced using IR FUSION for a camera that directly
        competes with Fluke's thermal imagers containing IR
18      Fusion technology. . . . Such use constitutes an
        infringement of Fluke's state and federal trademark
19      rights and a violation of unfair competition laws. Use
        of the identical mark on a directly competing product
20      makes it difficult to imagine that this trademark
        infringement was unintentional. Nevertheless, in an the
21      interest of an amicable resolution of this matter, please
        confirm that F[LIR] will . . . [i]mmediately cease use of
22      IR FUSION, or an confusingly similar mark[,] . . .
        [p]rovide an accounting of the materials
23      distributed . . . [so] Fluke [can] determine whether
        corrective advertising is necessary to rectify this
24      situation[,] . . . [and] [c]onfirm that F[LIR] will not
        use, register or seek to register IR Fusion or any
        confusingly similar mark[.]
25
26 (Sachs Decl. at 5-6.) On April 22, 2008, Richard O'Brien
27 ("O'Brien") of Sidley Austin LLP in Chicago, Illinois, responded to
   Sachs' cease-and-desist letter, stating:
28

Page 43 - OPINION AND ORDER

We represent FLIR . . . with respect to the matters
addressed in your letter of April 15, 2008. FLIR
disputes that 'IR-FUSION' is a valid trademark and
disputes that it had made any use of that term in a
trademark sense, versus a descriptive, generic, or other
sense. Nonetheless, in order to avoid devoting further
attention to incurring any expense with respect to this
issue, FLIR has taken reasonable steps to avoid any use
of the term 'IR-FUSION' in any way that could even be
argued to be a trademark use. Specifically, FLIR has
taken steps to remove all of the uses on its website of
the term 'IR-FUSION' that existed at the time you sent
your letter and has taken reasonable steps to recall and
avoid further dissemination of any marketing materials
that so use the term. We also assure you that although
FLIR plans to aggressively promote its own fusion
functionality, FLIR has no intention of registering 'IR-
FUSION' as a trademark or domain name.

(Sachs Decl. at 7.)

On August 5, 2010, Sachs sent a second cease-and-desist letter,
this time directly to O'Brien, indicating Fluke was "surprised and
disappointed to learn that FLIR [wa]s still using IR Fusion on its
website," despite FLIR's prior representations that it would not do
so. (Sachs Decl. at 8.) In support of her position, Sachs cited,
among other things, a September 1, 2008 press release that appeared
to have been posted after O'Brien responded to the original cease-
and-desist letter.[11] That letter also stated that unless FLIR
immediately stopped its infringing use of Fluke's mark, Fluke would
consider all legal options.

After receiving Sachs' August 5, 2010 letter, Davis proposed
a 30-day standstill period to Jonathan Graham ("Graham"), who is
general counsel to Fluke's parent company, Danaher Corporation.[12] At

---

[11] It is not entirely clear when Sachs became aware of the
September 1, 2008 press release or any other representative
example.

[12] Danaher Corporation's general counsel is located in
(continued...)

Page 44 - OPINION AND ORDER

that time, however, Graham was not prepared to agree to such a proposal. Most likely, this was due to the fact that Graham was not the one who sent the cease-and-desist letters, nor had he been informed about FLIR's alleged infringement of the IR Fusion mark. Rather, the cease-and-desist letters were sent by Sachs, a partner at Perkins Coie LLP in Seattle, Washington, who, on December 12, 2006, was appointed the attorney of record on filed with the United States Patent and Trademark Office ("USPTO") with respect to Fluke's IR Fusion trademark application.

On August 17, 2010, at 11:18 a.m., Davis emailed Graham indicating he needed to speak with him at his earliest convenience. At 1:13 p.m., Graham responded to the email and accompanying voice mail, stating:

> I got ahold of someone who could tell me they are quite confident Fluke is not about to sue F[LIR] imminently, but all learned that [the] people that have details [I] need to respond more thoroughly to the points you made are not available today[.] . . . So I think we can assure you that we are not going to get any perceived 'first mover' advantage and we'll keep i[t] that way until you and I have a conversation in which I am informed by the facts from Fluke's perspective.

(Johnson Decl. Ex. 27 at 1.) That same day, Davis sent a letter to Graham, stating:

> While you agreed to attempt to stop the filing of any lawsuit, given the fact that you are out of the country, you could offer no assurance that you would be able to do so. Following our conversation, I discussed the situation with our management and counsel. The fact that you were unaware of Fluke's recent letter and that you could not be certain that you could avoid an impending lawsuit, combined with the rejection of my . . . proposal, do not afford FLIR the comfort we were seeking. According we filed the suit we prepared, naming Fluke and

---

[12](...continued)
Washington, District of Columbia.

Sierra as defendants.  However, we remain willing to engage with you to resolve this matter through discussions after you have had a chance to investigate the claims between the parties.

(Johnson Decl. Ex. 28 at 2.)

On November 30, 2010, during a Rule 16 conference, Fluke's counsel informed the Court that (1) it intended to move to dismiss seven of the eight claims asserted by FLIR; and (2) with respect to FLIR's remaining claim (i.e., the declaratory judgment claim regarding the IR Fusion mark), Fluke would file "an answer and infringement counterclaim . . . once the motion to dismiss on the other seven claims is . . . decided." (Johnson Decl. Ex. 29 at 3.) That same day, Fluke and Sierra each filed a motion to dismiss. Resolution of Defendants' motions to dismiss was delayed, however, after FLIR filed a first amended complaint as a matter of course in December 2010.  Once again, Defendants moved to dismiss FLIR's claims on January 27, 2011.  Oral argument was held on April 25, 2011, and the Court issued its Opinion and Order on May 10, 2011. On May 27, 2011, Fluke filed its answer and counterclaims in accordance with Fluke's counsel's representations during the November 30, 2010 Rule 16 conference.

The Ninth Circuit has previously observed that "[b]ecause a claim of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000).  This observation holds true in the present case. FLIR asserts that Fluke knowingly failed to pursue its trademark and unfair competitions claims until May 27, 2011, even though the applicable 2-year laches period had expired on April 15, 2010 (two

Page 46 - OPINION AND ORDER

years after Fluke mailed the original cease-and-desist letter).
FLIR's argument flips the summary judgment standard on its head by
taking the evidence in the light most favorable to itself.  First,
and perhaps most importantly, FLIR's argument fails to take into
account the fact that its April 22, 2008 response to Fluke's
original cease-and-desist letter could reasonably be interpreted as
an agreement to stop all allegedly infringing use.  *See Bad Boy,
Inc. v. Bad Boy Enters., Inc.*, 1:08-cv-00050 JHL, 2009 WL 4251022,
at *5 (E.D. Ark. Nov. 24, 2009) (denying summary judgment on laches
defense where parties disputed the message conveyed by their letters
regarding a trademark, stating: "The fact finder must determine what
message was conveyed by the letters between [Defendant] and
[Plaintiff]"); *see also Liquid Glass Enters., Inc. v. Dr. Ing.
h.c.f. Porsche AG*, 8 F. Supp. 2d 398, 405-06 (D. N.J. 1998)
(concluding that seven year delay was "completely excusable" where
cease-and-desist letters were sent by a party when it became aware
of improper advertisements, and the opposing party's response
represented that the matter could be solved amicably) (citing *E-
Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983))).
According to Sachs, she "accepted and relied on FLIR's
representations that it would stop its infringing use in good faith,
and with expectation that FLIR would respect Fluke's intellectual
property rights in the IR Fusion Mark."  (Sachs Decl. ¶ 10.)

       Second, FLIR's claim that Fluke did not file its counterclaims
until nine months after the laches period allegedly ended (i.e., on
May 27, 2011, nine months after the 2-year anniversary of the
original cease-and-desist letter), is particularly self-serving in
light of Fluke's counsel's representations during the November 30,

Page 47 - OPINION AND ORDER

1  2010 Rule 16 conference and FLIR's subsequent filing of an amended

2  complaint in December 2010, which necessitated another round of

3  dispositive motions and delayed Fluke's filing of its counterclaims

4  by several months. *See generally Becker v. Fitzgerald*, No. 94 C

5  7646, 1995 WL 215143, at *2 (N.D. Ill. Apr. 10, 1995) (recognizing

6  that if a motion under Rule 12 has been served, the defendant's

7  single answer is to be made *after the ruling on the motion* within

8  the limits set by Rule 12(a)(4)(A)).

9       Third, and finally, it is of particular importance that, as of

10 August 2010, FLIR and Fluke were attempting to resolve this matter

11 out of court.[13] *Cf. Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610

12 F.3d 1171, 1183 (9th Cir. 2010) ("An additional delay of two years

13 ensued before Toyota brought this suit, but during that period the

14 parties were actively seeking to resolve this matter out of court.

15 It was not unreasonable for Toyota to attempt to avoid the expense

16 and inconvenience of a lawsuit.")

17      In short, viewing the evidence in the light most favorable to

18 Fluke, there is a genuine issue of fact as to whether Fluke filed

19 its trademark and unfair competition claims within the 2-year

20 limitations period. As a result, I cannot conclude that Fluke's

21 delay in bringing its counterclaims was either reasonable, or

22 unreasonable, as a matter of law. FLIR's motion for summary

23 judgment is therefore denied on this ground. *See adidas America,*

24 *Inc. v. Payless Shoesource, Inc.*, 529 F. Supp. 2d 1215, 1253-54 (D.

25 Or. 2007) (making similar observations).

26 *///*

27 ─────────────────

28      [13] (Pl.'s Reply Br. at 8 n.15.)

Page 48 - OPINION AND ORDER

**3.   *Fluke's "Other" False Advertising Counterclaims***

FLIR moves the Court for an ordering granting it summary judgment on Fluke's false advertising counterclaims based on (1) FLIR's use of the terms IR Fusion and fusion in its advertisements; and (2) two FLIR power point presentations and two similar advertisements, the "banana advertisment" and the "12 Things" promotional literature.   As a preliminary matter, I have already concluded that there are issues of fact regarding the validity of Fluke's mark and the applicability of laches.   Thus, FLIR is not entitled to summary judgment on the basis of either the validity of the Fluke's mark, nor laches.

   **a.   *FLIR's Use of the Terms IR Fusion and Fusion in its Advertisements***

FLIR claims that Fluke has no evidence that its use of terms IR Fusion and fusion in advertisements that plainly identify FLIR as the source of the advertised products, and do not mention Fluke, are false and misleading.   FLIR also argues that Fluke has no expert testimony, including no consumer surveys or other extrinsic evidence, to support its contention that FLIR's advertisements are false and misleading with respect to whether FLIR or Fluke is the *source* of the fusion functionality available on FLIR thermal imaging cameras.

These arguments miss the mark.   As discussed above, literal falsity is a question of fact, and summary judgment is inappropriate where sufficient evidence exists to permit a juror to conclude that an advertisment is literally false.   *See Southland Sod*, 108 F.3d at 1146 (reversing summary judgment where a reasonable juror could conclude advertisements were literally false); *see also Time Warner*,

Page 49 - OPINION AND ORDER

1 497 F.3d at 157 ("When an advertisement is shown to be literally or
2 facially false, consumer deception is presumed, and the court may
3 grant relief without reference to the advertisement's actual impact
4 on the buying public.")

5     With this in mind, Fluke's trademark-related false advertising
6 counterclaim is predicated upon its contention that FLIR is falsely
7 representing that its product has certain qualities that it in fact
8 does not actually have (i.e., fusion functionality equivalent to
9 that of IR Fusion). *See generally Rhone-Poulenc*, 93 F.3d at 516
10 (recognizing that an advertisement can be literally false if it
11 falsely represents that the product has certain qualities that it
12 does not actually have). According to Fluke's counsel, "as Fluke
13 and FLIR's separate patents indicate, each company's respective
14 feature is not the same." (Fluke's Resp. Opp'n at 30.)   FLIR
15 counters by arguing that Fluke has made no showing that any FLIR
16 advertisement falsely states that they include Fluke's, rather than
17 FLIR's, fusion functionality.  However, this does not alleviate my
18 concern that FLIR's use of the term IR Fusion, which may or may not
19 be a valid mark, could necessarily falsely imply that FLIR's cameras
20 possess the same fusion functionality as Fluke's cameras.   I
21 therefore deny FLIR's motion for summary judgment on Fluke's
22 trademark-related false advertising counterclaim on this ground as
23 well.

24     In a footnote in its reply brief, FLIR argued that expert
25 reports on which Fluke relies, including the report of Fluke's
26 damages expert, Serena Morones, were not signed under oath, and thus
27 are inadmissible.  I overrule FLIR's objections as moot because the
28 evidence objected to was not considered and Fluke avoids this motion

Page 50 - OPINION AND ORDER

1  for summary judgment without consideration of this evidence. No

2  implications may be drawn regarding the use of the evidence at

3  trial.

4      **b.   FLIR's Two PowerPoint Presentations, the "Banana Advertisement" and the "12 Things" Promotional Literature**

5

6      FLIR argues it is entitled to summary judgment on Fluke's

7  false advertising claims regarding two FLIR PowerPoint presentations

8  and two similar advertisements, the "banana advertisment" and the

9  "12 Things" promotional literature, because Fluke cannot show any

10  compensable injury resulting from such advertisements.  Paragraphs

11  38 and 39 of Fluke's counterclaims against FLIR concern the two

12  PowerPoint presentations that are allegedly false.  Those paragraphs

13  provide:

14          38.  F[LIR]'s misrepresentations are not limited to
       its own thermal imaging cameras.  In a customer-directed
15       presentation entitled 'Why Flir for Architectural
       Testing,' F[LIR] states that the file format for images
16       captured with the Fluke Ti32 camera is 'proprietary' and
       that the Fluke Ti32 camera does not have an insulations
17       alarm.  Both statements are false.  Fluke's thermal
       imaging cameras also capture images in a non-proprietary
18       bitmap format and have an insulations alarm. Furthermore,
       in a series of images taken in a dimly-lit room, F[LIR]
19       asserts that a dark thermal image (contrasted with a
       bright thermal image captured with the Flir b60 camera)
20       was captured by a Fluke thermal imaging camera when it
       was not.

21          39.  In another consumer-directed presentation
       entitled 'T-Series Line Up, Comparison to the Fluke
22       Ti32,' Flir states that the Ti32 camera's manual focus
       'will result in blurry images.' This statement is false
23       and misleading, since clear images are routinely captured
       with Fluke's manual focus.  Furthermore, on a slide
24       entitled 'F[LIR] Has a Lamp, Fluke Does Not!,' F[LIR]
       states that 'without a lamp the Fusion feature is
25       rendered useless in poorly lit areas!'  F[LIR] then
       asserts through the use of side-by-side images that a
26       F[LIR] camera captured bright thermal images while a
       Fluke camera captured dark images.  But the assertion is
27       false—the dark images portrayed in the presentation are
       in a square format that could not have been taken by a
28       Fluke thermal imaging camera, which captures images in a

Page 51 - OPINION AND ORDER

landscape format.  Finally, F[LIR] states in a slide
entitled 'F[LIR] Has Radiometric JPEG, Fluke Does Not!,'
that 'Fluke's software has to be installed on each
computer to view the images.'  F[LIR] also makes the same
statement in an advertisement for its i-series thermal
imaging cameras.  These statements are false and
misleading because images are captured on Fluke's thermal
imaging cameras in a bitmap standard format that does not
require the installation of Fluke's software on each
computer in order to view the images.

(Fluke's Answer and Countercls. at 24-25.)

Paragraphs 40 and 41 of Fluke's counterclaims against FLIR
concern the so-called "banana advertisement" and "12 Things"
promotional literature.  Those paragraphs provide:

40. F[LIR] has also used false and misleading
marketing materials at trade shows.  In one such
instance, F[LIR] sales representatives affixed yellow
banana cartoons on actual yellow bananas (clearly
referring to Fluke's distinctive yellow trade dress) that
include a badge across the body of the cartoon stating
'Drop Proof' and a dialogue bubble stating 'I cannot
measure, but you can drop me.'  This tasteless marketing
piece's assertion that Fluke thermal imaging cameras
cannot measure is false and misleading, since Fluke's
thermal imaging cameras can indeed measure.

41. Finally, although all thermal imaging cameras
have temperature accuracy variations, F[LIR]'s
advertisement entitled '12 Things to Know Before Buying
an Infrared Camera' falsely claims that unless a thermal
imaging camera offers a temperature accuracy
specification that is consistent with those of F[LIR]'s
cameras, '[y]our images and temperature measurements will
be wrong.'

(Fluke's Answer and Countercls at 25.)

FLIR's only argument with respect to the two PowerPoint
presentations, the "banana advertisement" and the "12 Things"
promotional literature is that Fluke has no evidence that it has
suffered any injury from those allegedly false advertisements, which
in turn entitles FLIR to summary judgment.  Upon review, I conclude
that FLIR has not met its burden of establishing the absence of a
genuine issue of material fact.  *Cf. Southland Sod*, 108 F.3d at

Page 52 - OPINION AND ORDER

1145-46 (recognizing that an inability to show actual damages does not alone preclude recovery, nor does it warrant the grant of summary judgment, because "the preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances.") Accordingly, I deny FLIR's motion for summary judgment on Fluke's counterclaims based on the FLIR's two PowerPoint presentations, the "banana advertisement" and the "12 Things" promotional literature.

### IV.  CONCLUSION

Consistent with the discussion above, Fluke's motion (Docket No. 177) for summary judgment on its counterclaim for false advertising is DENIED; Fluke's motion (Docket No. 178) for summary judgment on FLIR's claims for false advertising, trade libel/commercial disparagement and civil conspiracy is GRANTED in part and DENIED in part; Sierra's motion (Docket No. 175) for summary judgment is GRANTED in its entirety; and FLIR's motion (Docket No. 176) for summary judgment is DENIED in its entirety.

IT IS SO ORDERED.

Dated this  9  day of October, 2012.

/s/ Dennis J. Hubel
_____
DENNIS J. HUBEL
United States Magistrate Judge

Page 53 - OPINION AND ORDER