1

2

3

4

5

6

7                      UNITED STATES DISTRICT COURT

8                          DISTRICT OF OREGON

9                          PORTLAND DIVISION

10

11

12  FLIR SYSTEMS, INC., an Oregon            No. 3:10-cv-00971-HU
    corporation,
13                                                    **OPINION AND**
          Plaintiff,                                           **ORDER**
14
          v.
15
    SIERRA MEDIA, INC., a Washington
16  corporation, and FLUKE CORPORATION,
    a Washington corporation,
17
          Defendants.
18  ────────────────────────────────────

19
                            COUNSEL
20
    Devon Zastrow Newman, Schwabe, Williamson & Wyatt P.C., Portland,
21  Oregon, for Plaintiff FLIR Systems, Inc.

22  William A. Brewer III, John W. Bickel II, Michael J. Collins and
    Robert M. Millimet, Bickel & Brewer, Dallas, Texas, for Plaintiff
23  FLIR Systems, Inc.

24  Kenneth R. Davis II and Parna A. Mehrbani, Lane Powell P.C.,
    Portland, Oregon, for Defendant Fluke Corporation.
25
    Dane H. Butswinkas and Matthew V. Johnson, Williams & Connolly LLP,
26  Washington, District of Columbia, for Defendant Fluke Corporation.

27  Benjamin N. Souede and David H Angeli, Angeli Law Group LLC,
    Portland, Oregon, for Defendant Sierra Media, Inc.
28

    Page 1 - OPINION AND ORDER

1 HUBEL, Magistrate Judge:

2  If ever there were a case where the Court hoped that the
3 "parties [would just decide] to chill," *Mattel, Inc. v. MCA*
4 *Records, Inc.*, 296 F.3d 896, 908 (9th Cir. 2002), this would be it.
5 Indeed, it is an understatement to say that this case has been
6 hotly contested, or that there is some animosity between the two
7 business competitors involved.  The parties have had a multitude of
8 disagreements  long  before  this  case,  and  their  contentious
9 relationship resulted in protracted litigation here and acrimonious
10 discovery disputes.   Tit-for-tat arguments were raised at every
11 conceivable opportunity.  Conferral did not always occur.  At one
12 point, the Court was compelled to remind counsel to be courteous
13 and  professional  in  their  dealings  with  one  another.   And  the
14 kitchen-sink approach to trial, offering every conceivable piece of
15 evidence  and  raising  as  many  objections  as  possible,  led  to
16 laborious, seemingly never-ending pretrial sessions to resolve the
17 raft of unfocused issues raised by the parties.  To adapt an old
18 saying, "Too many lawyers spoil the case."

19  In December 2012, the Court conducted a nine-day jury trial on
20 Plaintiff FLIR System, Inc's ("FLIR") claim of false advertising
21 and  on  Defendant  Fluke  Corporation's  ("Fluke")  counterclaims  of
22 false advertising (six counts), trademark infringement, and unfair
23 competition.   The jury returned a verdict in favor of FLIR on its
24 false advertising claim and awarded $103,000 in damages.  The jury
25 also returned a verdict in favor of Fluke on all but three counts
26 of false advertising and awarded $4,136,975 in damages.  In January
27 and  February  2013,  the  parties  filed  the  following  post-trial
28 motions which are now before the Court: (1) Fluke's redaction

Page 2 - OPINION AND ORDER

request; (2) Defendant Sierra Media's ("Sierra") motion for an award of attorney's fees pursuant to 15 U.S.C. § 1117(a); (3) Fluke's motion re: post-trial issues; and (4) FLIR's motion for post-trial relief, judgment as a matter of law, or alternatively, for a new trial.

## I. LEGAL STANDARD

### A.    Judgment as a Matter of Law

Under Federal Rule of Civil Procedure ("Rule") Rule 50(b), a party who has moved for judgment as a matter of law ("JMOL") at the close of all the evidence may renew the motion after entry of judgment. Fed. R. Civ. P. 50(b). However, "[a] party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

When considering a Rule 50(b) motion, the court must view the evidence in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *Horphag Research, Ltd. v. Pellegrini*, 337 F.3d 1036, 1040 (9th Cir. 2003). "Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Ostad v. Oregon Health Scis. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003). Because the court may not substitute its view of the evidence for that of the jury, it neither makes credibility determinations, nor weighs the evidence. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002), *aff'd*, 123 S. Ct. 2148 (2003). Indeed, the court must "disregard all evidence favorable to the moving party that the jury

1  is not required to believe." *Reeves v. Sanderson Plumbing Prods.,*
2  *Inc.*, 530 U.S. 133, 151 (2000).

3  **B.   New Trial**

4      The court may grant a new trial "for any of the reasons for
5  which new trials have heretofore been granted." FED. R. CIV. P. 59.
6  Those reasons include when "the verdict is contrary to the clear
7  weight of the evidence, or is based upon evidence which is false,
8  or to prevent, in the sound discretion of the trial court, a
9  miscarriage of justice." *Silver Sage Partners, Ltd. v. City of*
10 *Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (quoting
11 *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir.
12 1999)).   "While the trial court may weigh the evidence and
13 credibility of the witnesses, the court is not justified in
14 granting a new trial 'merely because it might have come to a
15 different result from that reached by the jury.'" *Roy v.*
16 *Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990)
17 (quoting *Wilhelm v. Associated Container Transp. (Australia) Ltd.*,
18 648 F.2d 1197, 1198 (9th Cir 1981)).

19                      **II. DISCUSSION**

20 **A.   Sierra's Entitlement to Fees**

21     Sierra has moved for an award of attorney's fees based on the
22 Court's conclusion—at the summary judgment stage—that FLIR lacked
23 prudential standing to sue Sierra for false advertising under the
24 Lanham since they are not competitors.   FLIR opposes Sierra's
25 motion for attorney's fees on the grounds that (1) Sierra is not
26 entitled to fees under the applicable legal standard, (2) FLIR had
27 substantial legal and factual support for claiming that Sierra was
28 jointly and severally liable with Fluke for false advertising, and

1  (3) it would be inequitable to award Sierra attorney's fees because
2  Sierra failed to raise its contention that FLIR lacked prudential
3  standing prior to summary judgment and Sierra admitted during
4  discovery that Fluke voluntarily agreed to, and did in fact, pay
5  Sierra's attorney's fees in this case.

6      Section 35 of the Lanham Act permits an award of attorney's
7  fees to a "prevailing party" in "exceptional cases." 15 U.S.C. §
8  1117(a). The Ninth Circuit has held that the exceptionality
9  "requirement is met when the case is *either* groundless,
10  unreasonable, vexatious, *or* pursued in bad faith." *Cairns v.*
11  *Franklin Mint Co.*, 292 F.3d 1139, 1156 (9th Cir. 2002) (citation
12  and internal quotation marks omitted). Under § 1117(a), an award
13  of attorney's fees is "never automatic and may be limited by
14  equitable considerations." *Adidas Am., Inc. v. Payless Shoesource,*
15  *Inc.*, No. 01-1655-KI, 2009 WL 302246, at *1 (D. Or. Feb. 9, 2009)
16  (quoting *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 711
17  (9th Cir. 1999)).

18      Sierra proceeds on the theory that FLIR's Lanham Act false
19  advertising claim against it was groundless. As Sierra points out,
20  FLIR opposed its motion for summary judgment by relying primarily,
21  either directly or indirectly, on Second Circuit case law. In an
22  Opinion and Order dated October 9, 2012, this Court agreed with
23  Sierra's argument that FLIR's reliance on such cases was misplaced
24  and tantamount to ignoring Ninth Circuit precedent in favor of the
25  Second Circuit's directly conflicting standard. That decision was
26  based upon the Court's reading of *Jack Russell Terrier Network of*
27  *Northern California v. American Kennel Club, Inc.*, 407 F.3d 1027
28  (9th Cir. 2005), where the Ninth Circuit stated that "different

Page 5 - OPINION AND ORDER

causes of action alleged pursuant to the different subsections of 15 U.S.C. § 1125(a) have different standing requirements." *Id.* at 1037.  Under the "false association" prong of § 43 of the Lanhan Act, 15 U.S.C. § 1125(a)(1)(A), the parties are not required to be competitors "in the traditional sense." *Jack Russell*, 407 F.3d at 1031.  By contrast, for standing pursuant to the "false advertising" prong of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), "a plaintiff must show: (1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant." *Jack Russell*, 407 F.3d at 1037; *Barrus v. Sylvania*, 55 F.3d 468, 470 (9th Cir. 1995) (explaining that standing under the "false advertising" prong requires a "commercial injury based upon a misrepresentation about a product, and also that the injury was 'competitive,' i.e., harmful to the plaintiff's ability to compete with the defendant.")[1]

This dichotomy is not present in the Second Circuit because, under its reasonable interest approach, "a plaintiff asserting a false advertising claim under § 43(a) need not be a 'competitor.'" *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1166

---

[1] As now-Justice Alito explained in *Conte Bros Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3d Cir 1998), the Ninth Circuit's approach will produce divergent results depending on which of § 43(a)'s prongs is at issue: "Applying this dichotomous approach, the Ninth Circuit has held that a plaintiff who alleged his name was replaced with that of another actor had standing to sue the movie's producer under the 'false association' prong even though he was not in competition with the producer. . . . On the other hand, a movie producer lacked standing under the 'false advertising' prong to bring a § 43(a) suit against various movie theaters who falsely described the movie as bearing an 'R' rating as opposed to a 'PG' rating because the parties were not competitors." *Id.* at 232 (internal citations omitted).

Page 6 - OPINION AND ORDER

1  (11th Cir. 2007) (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d
2  1105, 1111 (2d Cir. 1997)).  Indeed, as the district court stated
3  in *Grant Airmass Corp v. Gaymar Industries, Inc.*, 645 F. Supp. 1507
4  (S.D.N.Y. 1986), a case heavily relied upon by FLIR at the summary
5  judgment stage, "[o]ur Court of Appeals has held that competitive
6  injury is not required for recovery under section 1125(a)." *Id.* at
7  1511 (citation and internal quotation marks omitted).

8      FLIR claims that its reliance on Second Circuit case law was
9  merely a good faith attempt to extend the law of this circuit,
10 which should preclude a finding of exceptionality under the Lanham
11 Act.  The district court's decision in *Cairns v. Franklin Mint Co.*,
12 115 F. Supp. 2d 1185 (C.D. Cal. 2000), and the Fifth Circuit's
13 decision in *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519 (5th
14 Cir. 2002), are instructive in this regard.  In *Cairns*, the court
15 concluded that the plaintiffs' false endorsement claim was not
16 "exceptional" under § 1117(a) of the Lanham Act, stating: "Although
17 it is clear that this case was well outside the bounds of any
18 previous decision, plaintiffs' claim could be considered an attempt
19 to extend existing law." *Cairns*, 115 F. Supp. 2d at 1188.  The
20 *Amway* court vacated and remanded the district court's award of
21 attorney's fees under § 1117(a) on similar grounds: "The question
22 of standing under the Lanham Act to sue for an illegal pyramid
23 scheme was difficult and novel.  A party that predicates its legal
24 claim on a controversial and unsettled legal theory should not face
25 sanctions under . . . § 1117(a) when the court ultimately rejects
26 the claim." *Amway*, 280 F.3d at 531-32.

27     In a recent decision from the Central District of California,
28 the district court explained that a Lanham Act claim "is considered

Page 7 - OPINION AND ORDER

legally groundless where there is 'no legal basis' for the claim itself, which instead rests on 'absurd' or 'just short frivolous' contentions of law." *Brown v. Elec. Arts, Inc.*, 722 F. Supp. 2d 1148, 1152 (C.D. Cal. 2010) (quoting *Cairns*, 115 F. Supp. 2d at 1188-89). "[W]hen the Ninth Circuit has affirmed a denial of attorneys' fees based on a finding that the case was not exceptional, the key factors appear to be that the party against whom attorneys' fees are sought 'raised debatable issues' and had a legitimate reason for bringing its claims." *Icebreaker Ltd. v. Gilmar S.p.A.*, No. 3:11-cv-00309-BR, 2013 WL 638926, at *3 (D. Or. Feb. 20, 2013) (collecting cases).

Here, in addition to the contention that FLIR had no legal basis to pursue its claim, Sierra argues that FLIR's false advertising claim was factually groundless because FLIR knew Sierra was not its competitor. In the Court's view, however, it is apparent FLIR was attempting to rely on a legal theory that the Court determined was not sufficient to survive summary judgment (i.e., that Sierra was jointly and severally liable with Fluke), not assert that Sierra was in fact its competitor. Nor does the Court believe that FLIR engaged in bad faith or unreasonable conduct in pursuing its claim against Sierra. The Court will therefore limit its analysis to whether FLIR's Lanham Act claim was legally groundless.

Certainly the language used in this Court's October 9, 2012 Opinion and Order suggests a strong endorsement of Sierra's position. This was based, in large part, on FLIR arguing that "the principle on which Sierra relie[d]"—the competitive prong of *Jack Russell*—did not apply "where, as here, a co-defendant is jointly

1  and severally liable with [the] plaintiff's competitor for false
2  advertising," (FLIR's Resp. Opp'n Sierra's Mot. Summ. J. [Docket
3  No. 194] at 7), and then proceeding to direct the Court's attention
4  to Second Circuit case law without acknowledging that the Second
5  Circuit and Ninth Circuit analyze the standing of commercial
6  plaintiffs by applying differing standards (e.g., the reasonable
7  interest approach versus the Ninth Circuit's so-called dichotomous
8  approach).

9       Nevertheless, the Court cannot say that FLIR's Lanham Act
10  false advertising claim was legally groundless or that it rested on
11  "absurd" or "just short of frivolous" contentions of law.  In fact,
12  at the summary judgment stage, FLIR cited several cases that
13  provided some support for its position, even though the cases were
14  distinguishable from the present case.  *See Coastal Abstract Serv.,*
15  *Inc. v. First Am. Title Ins., Co.*, 173 F.3d 725, 734 (9th Cir.
16  1999) (concluding that injury was competitive under the Lanham Act
17  since the defendant's corporate officer sought by his statements to
18  divert business from the plaintiff to the defendant—which is type
19  of injury the Lanham Act was intended to remedy—and was not
20  entitled to hide behind the corporation where he is an actual
21  participant in the tort); *see also Transgo, Inc. v. Ajac*
22  *Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985) ("A
23  corporate officer or director is, in general, personally liable for
24  all torts which he authorizes or directs or in which he
25  participates, notwithstanding that he acted as an agent of the
26  corporation and not on his own behalf.") (internal quotation marks
27  omitted).  Accordingly, the Court denies Sierra's request for
28

Page 9 - OPINION AND ORDER

1  attorney's fees under § 1117(a) because this was not an exceptional
2  case.

3  **B.    FLIR's False Advertising Claim**

4       In its motion for post-trial relief, Fluke asks the Court to
5  adopt the jury's factual findings relating to Fluke's unclean hands
6  defense and enter judgment for Fluke dismissing FLIR's false
7  advertising claim.

8       **1.    Unclean Hands**

9       FLIR sued Fluke for false advertising under the Lanham Act,
10 alleging that a drop test video published by Fluke falsely depicted
11 the abilities of both the FLIR and Fluke cameras to withstand a
12 two-meter drop onto a concrete floor.  The jury found for FLIR on
13 that claim, but also found that FLIR falsely advertised its E-
14 series cameras' ability to pass a two-meter drop test.[2]  (Special
15 Verdict Form [Docket No. 394] Interrog. No. 4 at 2.)    Fluke
16 requests that the Court adopt the jury's factual finding and hold
17 that FLIR's false advertising claim with regard to the drop test
18 video is precluded by its unclean hands.  *See generally Bartee v.*
19 *Michelin N. Am., Inc.*, 374 F.3d 906, 912-13 (10th Cir. 2004)
20 ("Pursuant to the Seventh Amendment to the Federal Constitution, in
21 fashioning equitable relief, a district court is bound by a jury's
22 explicit findings of fact and those findings that are necessarily
23 implicit in the jury's verdict. . . . [T]he subsequent findings by
24 the trial judge in deciding the equitable claims [cannot] conflict
25 with the jury's [explicit and implicit] determinations.") (internal
26 quotations omitted).

27 _____

28      [2]  The clear weight of the evidence supported the jury's
   finding.

Page 10 - OPINION AND ORDER

As an initial matter, the parties dispute which evidentiary standard applies in evaluating an unclean hands defense.  In the joint proposed jury instructions, FLIR's instruction on unclean hands did not reference any evidentiary standard, while Fluke's indicated that unclean hands must be proved by a preponderance of the evidence.  *See Kelley Blue Book*, 802 F. Supp. 278, 292 (C.D. Cal. 1992) (applying a preponderance of the evidence standard to unclean hands); *see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987) (not referencing any evidentiary standard).  The instructions that went to the jury with respect to the evidentiary standard for unclean hands referenced the preponderance of the evidence.  Ultimately, however, the Court decided that

> the best thing to do on th[e] issue [wa]s to . . . present a [special interrogatory] to the jury about whether the E-Series ad is false or not, and if they determine it is not, we don't have an unclean hands issue to worry about. If we do, we can unravel the[] arguments and make a decision about what it means with respect to the ultimate outcome of FLIR's claim . . . .

(Trial Tr. vol. 8b [Docket No. 415], 1853:11-18, Dec. 18, 2012.) In other words, it was ultimately determined that the equitable defense of unclean hands would be decided by the Court, and if the jury determined that FLIR did not falsely advertise its E-series cameras' ability to pass a two-meter drop test, a finding of unclean hands would clearly be inappropriate because FLIR did not act inequitably.

After thoroughly reviewing the relevant case law post-trial, the Court has confirmed that it should apply the "clear, convincing evidence" standard enunciated in *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 833 (9th Cir. 2011), in deciding whether the

Page 11 - OPINION AND ORDER

1  unclean hands defense was established and should result in the loss
2  of FLIR's damages award.   A finding by the jury that FLIR's E-
3  series advertisements were false by a preponderance of the evidence
4  leaves the Court to decide if that conduct was sufficiently
5  inequitable to support an unclean hands defense. Had Fluke brought
6  a false advertising claim based on FLIR's E-series advertisements,
7  a preponderance of the evidence decision by the jury on the falsity
8  of the advertisements would be enough.   To block FLIR's claim,
9  however, this conduct must be sufficiently egregious by clear and
10 convincing evidence.   This determination the Court reserved for
11 itself.

12      Unclean hands "closes the doors of a court of equity to one
13 tainted with inequitableness or bad faith relative to the matter in
14 which he seeks relief, however improper may have been the behavior
15 of the defendant." *Adler v. Fed. Republic of Nigeria*, 219 F.3d
16 869, 877 (9th Cir. 2000) (quoting *Precision Instrument Mfg. Co. v.
17 Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).[3]  The doctrine
18 "bars relief to a plaintiff who has violated conscience, good faith
19 or other equitable principles in his prior conduct, as well as to
20 a plaintiff who has dirtied his hands in acquiring the right
21 presently asserted." *Seller Agency Council, Inc. v. Kennedy Ctr.
22 for Real Estate Educ., Inc.*, 621 F.3d 981, 986 (9th Cir. 2010)
23 (internal quotation and citation omitted); *see also Ellenburg v.
24 Brockway, Inc.*, 764 F.2d 1091, 1097 (9th Cir. 1985) (stating that
25 "what is material is not that the plaintiff's hands are dirty, but

26

27      [3] (*But cf.* FLIR's Resp. Opp'n Fluke's Mot. [Docket No. 440] at
28 11) ("FLIR's good faith is even more pronounced when compared to
   Fluke's intentionally false advertising.")

Page 12 - OPINION AND ORDER

that . . . the manner of dirtying renders inequitable the assertion of such rights against the defendants.") (internal quotation marks omitted; brackets deleted).

In order to prevail on an unclean hands defense, "the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims."[4]  *Fuddruckers*, 826 F.2d at 847.  The defense should only be applied "where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1254 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982) (citing *Ames Publ'g Co. v. Walker-Davis Publ'ns, Inc.*, 372 F. Supp. 1, 13-15 (E.D. Pa. 1974)). In an action for false advertising, the unclean hands of the plaintiff must relate to the same type of product the defendant allegedly falsely advertised. *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 849 (W.D. Tex. 2001).  "[W]hile the Ninth Circuit has recognized that the extent of the harm caused by the plaintiff's misconduct is a highly relevant consideration, it has not held that a defendant asserting an unclean hands defense is *required* to demonstrate prejudice." *Lenz v. Universal Music Corp.*,

---

[4] The district court's decision in *Infineon Technologies AG v. Volterra Semiconductor Corp.*, No C 11-6239 MMC, 2013 WL 1832558, at *4 n.7 (N.D. Cal. May 1, 2013), also provides instructive guidance. There, the plaintiff argued that unclean hands only applies where a plaintiff acted with fraudulent intent. *Id.* The *Infineon* court disagreed, stating: "Although the doctrine of unclean hands requires a showing of more than negligence, [plaintiff] cites to no case holding such defense always requires a showing of fraud. Rather, the cases on which [plaintiff] relies are limited to the specific circumstances presented therein." *Id.* (internal citations omitted).

Page 13 - OPINION AND ORDER

1  No. C 07-3783 JF, 2010 WL 702466 *7 (N.D. Cal. 2010) (internal
2  quotation marks omitted) (emphasis added).

3      Fluke argues that the sufficiency of the relation between
4  FLIR's conduct and its claim is demonstrated by the case law.  To
5  support its argument, Fluke relies primarily on *Stokely-Van Camp,*
6  *Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510 (S.D.N.Y. 2009), and
7  *Emco, Inc. v. Obst*, No. CV03-6432-R (RZX), 2004 WL 1737355 (C.D.
8  Cal. July 29, 2004).  In *Stokely-Van*, the court concluded, at the
9  preliminary injunction stage, that the maker of Gatorade—who
10  complained about Coca-Cola's claims regarding the presence of
11  calcium and magnesium in Powerade—had unclean hands because it
12  marketed the advantage of adding calcium and magnesium to its
13  product first, only later to disavow that claim and assert that
14  Coca-Cola must follow suit.  *Stokely-Van*, 646 F. Supp. 2d at 533-
15  34.  Similarly, in *Emco*, the court concluded that a Lanham Act
16  claim was barred by unclean hands, where the counterclaimant-seller
17  of industrial cutting tools, who used the brand name "Americut" and
18  American symbols in advertisements for products that were not
19  manufactured in the United States, alleged that its competitor
20  misled its customers as to the geographic origin of its goods by
21  removing country-of-origin labels.  *Emco*, 2004 WL 1737355, at *4-5.

22      FLIR advances several arguments as to why an unclean hands
23  finding would be inappropriate, including one that relates to
24  Fluke's counterclaim concerning FLIR's practice of superimposing
25  higher resolution images onto the liquid crystal display ("LCD") of
26  lower resolution cameras in its advertisements.  At the hearing on
27  the parties' motions in limine, the Court made clear that FLIR's
28  unclean hands defense could only pertain to Fluke's use of

Page 14 - OPINION AND ORDER

superimposed images in order to be sufficiently related to the subject matter of Fluke's counterclaim. In FLIR's view, a determination that it has unclean hands would be inconsistent with that ruling.

What FLIR neglects to mention, and what the Court addressed in denying one of FLIR's motions to compel discovery, is that many (if not all) of these advertisements "referred to both higher and lower resolution cameras." (Op. & Order on Mots. to Compel [Docket No. 190] at 12.) This is important because Fluke's false advertising claim based on FLIR's use of images in its advertisements was predicated almost exclusively, if not entirely, on advertisements where FLIR superimposed images produced by higher resolution cameras onto the view finder of lower resolution cameras that could *not* produce the images depicted on their view finders. The display of high resolution images (predominantly stand-alone images) in advertisements for cameras, some of which are capable of producing images of that resolution and some which are not, is quite different from superimposing high resolution images onto the view finders of only low resolution cameras incapable of producing the image. Indeed, the vast majority of the advertisements challenged by Fluke did not include any camera capable of producing the superimposed images.[5]

FLIR also argues that (1) its conduct was not inequitable because it acted in good faith when it believed, more than six months in advance of its new E-series cameras being offered for sale to the public, that it could meet the two-meter drop test

---

[5] And of course the jury determined FLIR did not falsely advertise its cameras in this fashion.

1  specification that it submitted for inclusion in the 2011 Grainger
2  catalog; and (2) the advertisement of its E-series cameras in the
3  2011 Grainger catalog is not "related in any way, much less
4  directly," to the drop test video and accompanying methodology
5  because FLIR did not falsely depict the results of a particular
6  drop test, deceptively compare FLIR's and Fluke's thermal imaging
7  cameras, or deliberately include the "stamp of approval" of a
8  purportedly "independent, third party" like Sierra. (FLIR's Resp.
9  Opp'n Fluke's Mot. at 5, 7.)

10     The Court is not persuaded by FLIR's arguments. In this case,
11  there is "clear, convincing evidence that [FLIR's] conduct was
12  inequitable and related to the subject matter of [its] false
13  advertising claims." *TrafficSchool*, 653 F.3d at 833 (internal
14  citation and quotation marks omitted; brackets deleted). The jury
15  was only asked and indeed found that FLIR falsely advertised the
16  ability of its E-series cameras to pass a two-meter drop test, and
17  that finding was supported by the evidence. Indeed, it was
18  uncontroverted. (*See* Trial Ex. 1015 at 1) (email dated March 18,
19  2010, stating "[i]t will take some time before our complete volume
20  line can do 2m drop."); (Trial Ex. 1126 at 4) (results from
21  September 2010 drop test conducted by FLIR, indicating "[s]erious
22  failures in every drop"); (Trial Ex. 1129 at 1) (internal email
23  among high-ranking FLIR employees dated October 12, 2010, stating
24  "at launch we don't we think we can have [a] camera that
25  withstand[s] [a] 2m drop.")

26     At trial, FLIR attempted to explain the problem away by
27  presenting evidence that it had developed a rubber boot that
28  resolved any issues with the E-series' ability to withstand a two-

Page 16 - OPINION AND ORDER

meter drop test.[6]  This boot was supplied to customers even though they were never informed prior to purchase of an E-series camera that the boot was necessary to survive a two-meter drop.  However, FLIR's vice president of product management, Torbjörn Hamrelius ("Hamrelius"), testified that, even with the rubber boot, the E-series still failed its two-meter drop test.  (Hamrelius Dep. 47:3-11.)  This removes any doubt that FLIR's advertisement of its E-series cameras in the 2011 Grainger catalog (published in both print and online versions) falsely represented that they could withstand a two-meter drop test.  And these false statements were disseminated to millions of potential customers, including two million individuals who received the catalog in hard copy form. (Trial Tr. vol. 2b [Docket No. 401], 415:6-8, 415:23-25, 416:1-15, Dec. 10, 2012.)  Thus, FLIR falsely advertised its camera's ability to withstand a two-meter drop just as it alleged Fluke did with respect to various cameras' ability to withstand such a drop.

FLIR claims its good faith handling of this situation is demonstrated by its efforts to correct the print version of the 2011 Grainger catalog.  "Grainger, however, informed FLIR that it was too late to remove the two-meter drop test specification because th[e] catalog had already gone to print."  (FLIR's Resp.

---

[6] FLIR also claims that it "warranted the E-series cameras sold by Grainger against any damage from being dropped."  (FLIR's Resp. Opp'n Fluke's Mot. at 10); (Hamrelius Dep. [Docket No. 382-1] 46:21-47:2) ("We . . . *thought* that, of course, we will warrant—anyone that's come out and dropped the camera, we will, well, warrant it.") (emphasis added).  As Fluke notes, "[t]o the extent some actual warranty program was put into effect, it was never advertised to Grainger customers."  (Fluke's Reply Mem. [Docket No. 450] at 9.)  Without evidence that the warranty program was, in fact, put into effect and that customers were made aware of it, it is illusory.

1  Opp'n Fluke's Mot. at 8-9.)  As Fluke points out, "notably absent
2  from the record is any evidence that FLIR ever attempted to ask
3  Grainger to remove the two-meter drop specification from the
4  Grainger *website*, which, presumably, would have been possible even
5  if the catalog already had gone to print."  (Fluke's Reply Mem. at
6  8); (Hamrelius Dep. 49:15-17) ("Well, at least we said we should
7  [attempted to correct the online version].  I haven't checked that
8  we actually did it."); (Trial Tr. vol. 2b, 427:25-428:3) ("Yeah, I
9  don't think [Grainger] changed the . . . language [on the website]
10 because I think at that point we felt . . . comfortable, with the
11 [rubber boot] as a solution, that it met the requirements that were
12 printed.")  In fact, the two-meter drop specification was still
13 available online in November 2011.  (Trial Tr. vol. 2b, 422:25-
14 423:20.)

15     The fact that the FLIR's advertisement in the 2011 Grainger
16 catalog was not comparative does not make it any less related to
17 subject matter of Fluke's drop test video.  Both concerned the same
18 product (a thermal imaging camera) and its ability to withstand a
19 two-meter drop test.  *See Stokley-Van*, 646 F. Supp. 2d at 533
20 (applying unclean hands even though one advertisement was
21 comparative and one was not); *see also Pom Wonderful LLC v. Welch*
22 *Foods, Inc.*, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010) ("[T]he
23 crux of [plaintiff's] Lanham Act claim is that [defendant] misleads
24 consumers to believe that its [white grape pomegranate] product
25 contains more pomegranate juice than it actually does, and that the
26 [white grape pomegranate] product in fact contains very little
27 pomegranate juice.  Thus, to prove unclean hands, [Defendant] must
28 demonstrate that [plaintiff] misleads consumers into believing its

Page 18 - OPINION AND ORDER

1  juice products contain more pomegranate juice than they actually
2  do, or that its products misrepresent the amount of juice(s) in
3  them."), *aff'd*, 468 F. App'x 688 (9th Cir. 2012).

4      Perhaps most importantly, FLIR's advertisement was in response
5  to the advantage FLIR perceived Fluke to have in ruggedness, and
6  which it expected Fluke to try and capitalize on.    Fluke's
7  capitalization was the drop test video.    (Trial Ex. 1015 at 1)
8  ("I've always felt the drop test exposes a vulnerability in our
9  camera design and I have been surprised it has taken Fluke this
10  long to expose this weakness. . . . Fluke is trying to play
11  hardball and I would like to make them regret they ever made this
12  [drop test] video."); (Trial Ex. 1027 at 1) ("Almost all tradeshows
13  Fluke's distributor has no other sales pitch except the droop proof
14  ability."); (Trial Ex. 1027 at 2) ("Seems that product management
15  is also aware of [the drop test video] and that our cameras are
16  indeed not built to withstand a 2 meter drop test.")    Indeed, the
17  FLIR advertisement came out after the false drop test video.

18      Moreover, the Court is not persuaded by FLIR's argument
19  pertaining to the timing of its inequitable conduct.    This is not
20  a case where Fluke is attempting to "dredge up inequitable conduct
21  of [FLIR] which has been discontinued for some time prior to the
22  suit."  *Pom Wonderful*, 737 F. Supp. 2d at 1109 (quoting 6 *McCarthy*
23  *on Trademarks & Unfair Competition* § 31:55 (4th ed. 2010)).    FLIR
24  made a representation to a major distributor in August 2010—the
25  same month that this suit was filed—knowing at the time that it was
26  not yet true.    The failure of FLIR to ensure that its E-series
27  cameras' could withstand the two-meter drop test led to the
28  publication of a statement in the 2011 Grainger catalog that the

Page 19 - OPINION AND ORDER

1  jury determined was false—a finding that is consistent with the
2  testimony provided by Hamrelius—and for which FLIR offered no
3  evidence the statement was ever true.

4      FLIR also suggests that the events related to its Grainger
5  advertisements "were rectified prior to entry of judgment." (FLIR's
6  Resp. Opp'n Fluke's Mot. at 12) (citing *McCarthy on Trademarks &*
7  *Unfair Competition* § 31:55 (4th ed. 2012)).  Setting aside the fact
8  that neither party has cited, nor has research revealed, a case
9  from the Ninth Circuit where an unclean hands defense was deemed
10 unavailable based on contemporaneous conduct that ceased prior to
11 entry of judgment, FLIR fails to cite evidence in the record
12 showing this actually occurred.  FLIR only points to: (1) a chain
13 of emails from May 2011 (i.e., in the midst of this litigation),
14 wherein FLIR's vice president of sales and marketing, Arpineh
15 Mullaney, asked a Grainger representative for an opportunity to
16 "refine" its catalog pages and FLIR's products manager, Mats
17 Ahlström ("Ahlström"), drew a line through "~~drop proof (6.5 ft)~~,"
18 (Trial Ex. 1075 at 1, 4); and (2) trial testimony provided by
19 FLIR's president of commercial sales, Andrew Teich ("Teich"), where
20 he discussed a drop apparatus developed in 2010 and concluded by
21 stating that the E-series continued to function throughout the
22 drops, although "early prototypes sustained some damage." (Trial
23 Tr. vol. 7b [Docket No. 410], 1566:6-1569:19, Dec. 17, 2012.)

24     Even if the Court assumes Grainger altered FLIR's pages in the
25 2012 catalog in accordance with Ahlström's email, this still says
26 nothing about the two million hard copy versions of the 2011
27 catalog that are presumably still in circulation.  Nor does it
28 explain why the drop test specification was still present on the

Page 20 - OPINION AND ORDER

1  Grainger website as late as November 2011.  (Trial Tr. vol. 2b
2  422:25-423:1-20);  (Trial  Ex.  1084)  (August  31,  2011  email
3  indicating that FLIR did "d[id]n't know when" the E-series would be
4  able to pass the two-meter drop test).[7]

5      In summary, the jury concluded that Fluke's drop test video
6  constituted false advertising and awarded FLIR $103,000 in damages.
7  Nevertheless, FLIR is not entitled to any damages in light of its
8  false advertising related to the same subject matter.  *See U-Haul*
9  *Int'l*, 522 F. Supp. at 1254 (unclean hands should be applied "where
10 some unconscionable act of one coming for relief has immediate and
11 necessary relation to the equity that he seeks in respect of the
12 matter in litigation.")  In other words, FLIR's false advertising
13 claim based on Fluke's drop test video being false regarding the
14 ruggedness of various cameras in a two-meter drop test is barred,
15 in light of FLIR's false advertising on the same subject matter, by
16 the doctrine of unclean hands.[8]

17     **2.   Injunctive Relief**

18     While  FLIR  may  come  with  unclean  hands,  this  does  not
19 foreclose the possibility it is entitled to injunctive relief:

20         [W]here the law invoked by the plaintiff is really for
           the protection of the public, unclean hands is not a
21         defense.  That is, if the evidence shows that plaintiff
           is engaging in inequitable practices, but defendant is
22         also  guilty  of  the  unfair  competition  charged,  an
           injunction should be granted notwithstanding the unclean
23

24
25     [7] The August 31, 2011 email refers to the E-series' ability to
   pass "without a boot."  (Trial Ex. 1084.)  As explained above,
26 Hamrelius testified that, even with the rubber boot, the E-series
   still failed its two-meter drop test.  (Hamrelius Dep. 47:3-11.)

27     [8] Based on this finding, the Court concludes that FLIR is not
28 entitled to an award of increased damages in connection with its
   false advertising claim.

1    hands maxim.  It is better to remedy one wrong than to
2    leave two wrongs at large.  If defendant thinks that
     plaintiff is guilty of inequitable conduct, he should
3    raise it in a counterclaim or in a separate suit against
     plaintiff.

4    6 *McCarthy on Trademarks & Unfair Competition* § 31:53 (4th ed.

5    2013).  Fifty years ago, in *Republic Molding Corp. v. B.W. Photo*

6    *Utilities*, 319 F.2d 347 (9th Cir. 1963), the Ninth Circuit made

7    similar observations:

8        Unclean hands . . . does not stand as a defense that may
         be properly considered independent of the merits of the
9        plaintiff's claim . . . . . Its assertion does not
         eliminate the need for the court to ascertain the
10       soundness of the plaintiff's claim.  In the interests of
         right and justice the court should not automatically
11       condone the defendant's infractions because the plaintiff
         is also blameworthy, thereby leaving two wrongs
12       unremedied and increasing the injury to the public.
         Rather the court must weigh the substance of the right
13       asserted by plaintiff against the transgression which, it
         is contended, serves to foreclose that right.  The
14       relative extent of each party's wrong upon the other and
         upon the public should be taken into account, and an
15       equitable balance struck.

16   *Id.* at 350.

17       Pursuant to 15 U.S.C. § 1116(a), the Court has the "power to

18   grant injunctions, according to the principles of equity and upon

19   such terms as the court may deem reasonable, . . . to prevent a

20   violation of subsection (a), (c), or (d) of Section 43" of the

21   Lanham Act.  15 U.S.C. § 116(a).  Here, the jury found that Fluke

22   made a literally false statement in a commercial advertisement,

23   that it was material, and that it had a tendency to deceive the

24   relevant purchasing public.  (*See* Jury Instructions [Docket No.

25   395] at 24-26) (setting forth the elements of a false advertising

26   under the Lanham Act).  Rather than leave this wrong at large, the

27   Court concludes that FLIR is entitled to an injunction.  *See Nat'l*

28   *Prods., Inc. v. Gamber-Johnson LLC*, 734 F. Supp. 2d 1160, 1171

     Page 22 - OPINION AND ORDER

1  (W.D. Wash. 2010) (granting injunction for the same reasons),

2  *aff'd*, 449 F. App'x 638 (9th Cir. 2011).

3       In light of the declaration submitted by Zachary Field on May

4  3, 2013, which provides hyperlinks where the drop test video can

5  still be found online, the Court disagrees with Fluke's contention

6  that the voluntarily removal of the drop test video moots FLIR's

7  claim for injunctive relief.[9]  *See Polo Fashions, Inc. v. Dick*

8  *Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986).  An injunction

9  will be granted to FLIR.  The Court will set a hearing at a later

10  date to address the terms/ scope of FLIR's injunction.

11       **3.  Attorney's Fees and Costs**

12       "The court in exceptional [false advertising] cases may award

13  reasonable attorney fees to the prevailing party."  15 U.S.C. §

14  1117(a).  Whether a case is exceptional is question of law for the

15  court, not the jury.  *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 656

16  (9th Cir. 2005).  According to the Ninth Circuit, "[i]t's not clear

17  [whether an] award of attorney's fees [under the Lanham Act] is

18  subject   to   equitable   doctrines   such   as   unclean   hands."

19  *TrafficSchool*, 653 F.3d at 833 n.9.  What is clear, however, is

20  that district courts must do more than simply examine the relief

21  awarded   to   plaintiffs   in   determining   whether   the   case   is

22  exceptional;   they   must   also   consider   whether   the   defendants'

23  conduct was fraudulent, deliberate, or willful.  *Id.* at 832.

24       Citing *Shum v. Intel Corp.*, 629 F.3d 1360 (Fed. Cir. 2010),

25  Fluke claims that the Lanham Act envisions only one prevailing

26  party since the plain language of § 1117(a) uses the singular of

27  _____

28       [9] The Court was still able to find the drop test video online
    in late-July 2013.

Page 23 - OPINION AND ORDER

"party" and the definite article "the."  *See* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.")  Relying primarily on the wording of Rule 54(d), *see* FED. R. CIV. P. 54(d) ("Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party."), the *Shum* court held that in patent cases there can be, "by definition," only one prevailing party, regardless of the fact that the outcome of a particular lawsuit might be mixed.  *See Shum*, 629 F.3d at 1366-67.

As FLIR points out, "Fluke . . . cites no Ninth Circuit or Lanham Act decisions in support of its contention that a suit must be viewed in its entirety and not on a claim-by-claim basis to determine whether a, or which, party prevailed." [sic] (FLIR's Reply Supp. [Docket No. 451] at 13.)  The parties have not cited, and the Court's research has not revealed, controlling or persuasive authority addressing this specific issue.  Fortunately, Congress has authorized the award of attorney's fees to "the prevailing party" in a number of statutes in addition to the Lanham Act. Cases interpreting other federal fee-shifting statutes provide meaningful comparisons.  *See Ketterle v. B.P. Oil, Inc.*, 909 F.2d 425, 429 (11th Cir. 1990) ("Many times the courts have used cases interpreting one fee shifting statute when faced with the interpretation of another.")

Under 42 U.S.C. § 1988, the court may award "a reasonable attorney's fee" to "the prevailing party" in various kinds of civil

Page 24 - OPINION AND ORDER

rights cases, including suits brought under § 1983.[10]   In *Fox v. Vice*, 131 S. Ct. 2205 (2011), the Supreme Court explained that a court can properly award fees to both parties under § 1988, despite its reference to "the prevailing party":

> In Hollywood, litigation most often concludes with a dramatic verdict that leaves one party fully triumphant and the other utterly prostrate.  The court in such a case would know exactly how to award fees (even if that anti-climactic scene is generally left on the cutting-room floor).  But in the real world, litigation is more complex, involving multiple claims for relief that implicate a mix of legal theories and have different merits.  Some claims succeed; others fail.  Some charges are frivolous; others (even if not ultimately successful) have a reasonable basis.  In short, litigation is messy, and courts must deal with this untidiness in awarding fees.
>
>         . . . .
>
>         . . . [W]e [have previously] noted the possibility that a plaintiff might prevail on one contention in a [civil rights] suit while also asserting an unrelated frivolous claim.  In this situation, we explained, a court could properly award fees [under § 1988] to both parties—to the plaintiff, to reflect the fees he incurred in bringing the meritorious claim; and to the defendant, to compensate for the fees he paid in defending against the frivolous one.  We thus made clear that a court may reimburse a defendant for costs under § 1988 even if a plaintiff's suit is not wholly frivolous.  Fee-shifting to recompense a defendant . . . is not all-or-nothing: A defendant need not show that every claim in a complaint is frivolous to qualify for fees.

*Id.* at 2213-14.

As the Supreme Court observed in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), a single civil rights lawsuit can contain

---

        **10**   There are similarities between Lanham Act and civil rights cases when it comes to awarding fees.  *See, e.g., Harris v. Maricopa County Superior Court*, 631 F.3d 963, 987 (9th Cir. 2011) (Bybee, J., concurring in judgment in part, but mostly dissenting) (arguing that a Lanham Act fee case should have controlled in a civil rights case because the standard for exceptionality was analogous).

Page 25 - OPINION AND ORDER

distinctly different claims for relief that are based on different
facts and legal theories, and as a result, "these unrelated claims
[must] be treated as if they had been raised in separate lawsuits."
*Id.* at 435.   In such circumstances, there is a real possibility
that both parties could be a "prevailing party" entitled to
attorney's fees under § 1988.   *See id.* at 435 n.10 ("If the
unsuccessful claim is frivolous, the defendant may [also] recover
attorney's fees incurred in responding to it.")

     These civil rights cases, of course, are distinguishable
insofar as they did not involve a situation where both parties
initially succeeded on the merits of a claim and/or were awarded
injunctive relief by the court. They do demonstrate, however, that
a federal fee-shifting statute's use of the definite article "the"
and singular of "party" does not necessarily foreclose the
possibility that there can be more than one prevailing party.

     "Almost all cases under the [Lanham] Act . . . , whether they
are suits for trademark infringement or for false advertising, are
between competitors." *Nightingale Home Healthcare, Inc. v.*
*Anondyne Therapy, LLC*, 626 F.3d 958, 962 (7th Cir. 2010) (internal
citations omitted).   At times, these competitors "use Lanham Act
litigation for strategic purposes—not to obtain a judgment or
defeat a claim but to obtain a competitive advantage independent of
the outcome of the case." *Id.* For example, "[t]he owner of a
trademark might bring a Lanham Act suit against a new entrant into
his market, alleging trademark infringement but really just hoping
to drive out the entrant by imposing heavy litigation costs on
him." *Id.* With these strategic motivations at play, a single
Lanham Act lawsuit can (and often times will) contain distinctly

1 different claims for relief that are based on different facts and
2 legal theories. That is precisely what took place here, and "these
3 unrelated claims [should] be treated as if they had been raised in
4 separate lawsuits." *Hensley*, 461 U.S. at 435.

5     Indeed, to be a prevailing party entitled to an attorney's
6 fees award under the Lanham Act, the party must have achieved a
7 material alteration in the legal relationship of the parties—i.e.,
8 relief that the would-be prevailing party sought, such as a
9 monetary judgment and/or permanent injunctive relief—that is
10 judicially sanctioned. *Fifty-Six Hope Road Music, Ltd. v.*
11 *A.V.E.L.A., Inc.*, 915 F. Supp. 2d 1179, 1183-84 (D. Nev. 2013).
12 When both parties advance some meritorious claim in a Lanham Act
13 suit, they will inevitably satisfy the definition of a "prevailing
14 party" unless there is a sufficient basis for denying a monetary
15 judgment *and* permanent injunctive relief—a rare situation in Lanham
16 Act litigation.

17     This does not mean that both parties would automatically
18 qualify for an award of fees, but it does mean that court must
19 undertake what appears to be a situation-specific exceptionality
20 inquiry that turns on the nature of the conduct for which the
21 opposing party was held liable or which was enjoined, and not, for
22 example, on FLIR's conduct that barred recovery of damages or
23 resulted in a damages award or injunction for Fluke on its claims.
24 *See TrafficSchool*, 653 F.3d at 832-33 (holding that the district
25 court applied the wrong legal standard by failing to consider the
26 opposing party's conduct that warranted the grant of injunctive
27 relief). For these reasons, the Court concludes that there can be
28 more than one prevailing party in the same Lanham Act suit.

Here, the Court concludes that FLIR was a prevailing party on its claim and that this case was exceptional. *See Watec*, 403 F.3d at 656 (exceptionality is question of law for the district court). Importantly, although FLIR failed to recover damages, it obtained a judgment and injunction that is beneficial to consumers and "vindicate[s] [its] right to a 'market free of false advertising.'" *TrafficSchool*, 653 F.3d at 832 (quoting *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 192 (2d Cir. 1980)). Moreover, the Court finds that Fluke's conduct warrants the imposition of attorney's fees. There is no doubt that Fluke deliberately published a literally false advertisement.[11]

To prove literal falsity, FLIR only needed to demonstrate that the drop test "was not sufficiently reliable to permit one to conclude with reasonably certainty that the test established the proposition for which it was cited." *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 971 (W.D. Wisc. 2010) (emphasis in the original) (citation and internal quotation marks omitted).[12] There was an abundance of evidence to support the conclusion that the drop test was not sufficiently reliable, including, among

---

[11] That is not to say that Fluke's primary purpose was to maliciously injure FLIR. Simply put, Fluke deliberately published an advertisement based on a test that was clearly not reliable (i.e., a literally false advertisement).

[12] *See also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) ("[A] competitor need not prove injury when suing to enjoin conduct that violates section 43(a). Thus, even if [a] [p]laintiff[] . . . fail[s] to raise a triable issue as to causation and injury, [its] Lanham Act claim would still be viable to the extent it sought an injunction.") (internal citation and quotation marks omitted); *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 818–19, 825 (9th Cir.1996) (plaintiff was entitled to attorney's fees when district court only awarded an injunction).

Page 28 - OPINION AND ORDER

1 others: (1) Fluke used what was essentially a home-made drop
2 apparatus; (2) Fluke did not subject its own comparable
3 articulating camera to the drop test; (3) FLIR's cameras were
4 placed in far more precarious positions on the drop apparatus; (4)
5 Fluke's own employee extensively participated in what was supposed
6 to be a test conducted by an independent third party; and (5) Fluke
7 was never able to locate the Fluke Ti32 shown in the drop test
8 video.

9      Accordingly, the Court will exercise its discretion and award
10 attorney's fees and costs to FLIR. *See World Triathalon Corp. v.*
11 *Dunbar*, 539 F. Supp. 2d 1270, 1288 (D. Haw. 2008) (concluding that
12 a prevailing party was entitled to costs and attorney's fees under
13 § 1117(a)); *Derek Andrew, Inc. v. Proof Apparel Corp.*, 528 F.3d
14 696, 702 (9th Cir. 2008) ("An award of reasonable attorneys' fees
15 and costs is expressly provided for in 'exceptional cases.'") FLIR
16 is ordered to submit its fee application with appropriate
17 supporting materials not later than August 19, 2013.

18      **4.   Prejudgment and Postjudgment Interest**

19      FLIR seeks an award of prejudgment and postjudgment interest.
20 (FLIR's Mot. Post-Trial Relief at 2); (*but cf.* FLIR's Reply Supp.
21 at 1) ("FLIR requests that the Court . . . award . . . prejudgment
22 interest.") FLIR does not specify whether its requests is limited
23 to the jury's damages award and/or an award of attorney's fees.

24      "In the Ninth Circuit, 'an award of prejudgment interest in a
25 case under federal law is a matter left to the sound discretion of
26 the trial court.'" *Cyclone USA, Inc. v. LL & C Dealer Servs., LLC*,
27 No. CV 03-992, 2010 WL 2132378, at *1 (C.D. Cal. May 24, 2010)
28 (quoting *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,*

Page 29 - OPINION AND ORDER

*Inc.*, 676 F.2d 1291. 1310 (9th Cir. 1982)). The Court has determined that FLIR is not entitled to prejudgment interest in light of the applicability of an equitable defense and the lack of a damages judgment in FLIR's favor. *See Brittingham v. Jenkins*, 914 F.2d 447, 457 (4th Cir. 1990) (reversing award of prejudgment interest on Lanham Act claim based on application of equitable defense).[13]

As to postjudgment interest, the governing statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). This language is mandatory, not discretionary. *See Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290 (9th Cir. 1995). "[T]he majority of the courts that have addressed the definition of the term 'money judgment' in § 1961(a) have held that a judgment that unconditionally entitles a party to reasonable attorney fees is [a] 'money judgment' contemplated by § 1961." *Boehner v. McDermott*, 540 F. Supp. 2d 310, 322 (D.D.C. 2008); *see also Auto. Club of New York, Inc. v. Dykstra*, No. 04 Civ. 2576(SHS), 2010 WL 3529235, at *5 (S.D.N.Y. Aug. 24, 2010) ("[O]ther circuits have held—correctly, in this Court's view—that prior to the date the amount of attorneys' fees is actually quantified, the damages are unliquidated and therefore are not a 'money judgment' within the meaning of section 1961.")

If and when a judgment for attorney's fees is entered, the Court will address postjudgment interest.

*///*

---

[13] FLIR cites *Brittingham* in support of its argument that Fluke's request for prejudgment interest should be denied.

## C.   Fluke's Trademark-Related Claims

Fluke moves the Court for entry of a final judgment in its favor and against FLIR on its trademark-related claims.   FLIR cross-moves for entry of a take-nothing judgment on Fluke's trademark-related claims on the grounds that those claims are barred by the doctrine of laches and/or because Fluke's "IR Fusion" trademark is invalid.

### 1.   Laches

Laches is an equitable defense to Lanham Act claims that "embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark [and confusingly similar terms], and then later come forward and seek to enforce its rights." *Internet Specialties W., Inc. v. Milon-Di Giorgio Enters., Inc.*, 559 F.3d 985, 989-90 (9th Cir. 2009). "[T]he existence of laches is a question primarily addressed to the discretion of the trial court." *Czaplicki v. Hoegh Silvercloud*, 351 U.S. 525, 534 (1956).   It is well settled that laches is a valid defense to Lanham act claims.   *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).   The test for laches is a two-part inquiry: first, did the plaintiff unreasonably delay in filing suit; and second, was the defendant prejudiced by the delay.   *Internet Specialties*, 559 F.3d at 990.

A court's "laches determination is made with reference to the limitations period for the analogous action at law." *Jarrow*, 304 F.3d at 835.   This court has looked to the two-year statute of

limitations for fraud claims, OR. REV. STAT. § 12.110, by analogy.[14]
*Adidas America, Inc. v. Payless Shoesource, Inc.*, 540 F. Supp. 2d
1176, 1180 n.1 (D. Or. 2008); *Johannsen v. Brown*, 797 F. Supp. 835,
839-40 (D. Or. 1992); *Or. Ethiopian Cmty. Org. v. Gessesse*, No. 06-
109-JE, 2007 WL 1887402, at *9 (D. Or. June 27, 2007).

The two-year laches period starts when the party "knew or
should have known about its potential cause of action." *Internet
Specialties*, 559 F.3d at 990. In this case, the jury determined
that Fluke knew or should have known of its potential trademark-
related claims by April 15, 2008. (Special Verdict Form, Interrog.
11 at 4.) Fluke did not pursue its trademark-related claims until
after FLIR initiated this lawsuit in August 2010 and clearly after
the two-year laches period had expired.

Ordinarily, "[a] presumption of both unreasonable delay and
prejudice arises if a plaintiff files suit more than two years
after the plaintiff knew or should have known of the alleged
infringer's activity." *Adidas*, 540 F. Supp. 2d at 1180. However,
the presumption evaporates when there are "disputed issues of
material fact as to when the [claimant] knew or should have known
of the alleged infringer's activity, and thus whether the
[claimant] filed suit outside the analogous statute of limitations
period." *Adidas*, 540 F. Supp. 2d at 1181; *A.C. Aukerman Co. v.
R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037-38 (Fed. Cir. 1992).
At the summary judgment stage, the Court determined that there was

---

[14] (*See* Joint Pretrial Order [Docket No. 370] at 3-4)
(stipulation that FLIR is an Oregon corporation with its principal
place of business in Oregon; this Court has jurisdiction over the
case and parties; and Oregon law provides the governing law).

Page 32 - OPINION AND ORDER

1  a genuine issue of fact as to whether Fluke filed its trademark-
2  related claims outside of the laches period.  *See generally Couveau*
3  *v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) (stating
4  that laches "is seldom susceptible of resolution by summary
5  judgment.")    The case law required little of Fluke to raise a
6  material issue of fact with respect to FLIR's laches defense.  The
7  Court presented what it perceived to be a weak question of fact as
8  to when Fluke knew or should have known of the alleged
9  infringement.  In any event, Fluke presented evidence in opposition
10 to the laches defense resulting in FLIR being "required to
11 affirmatively prove both elements of laches by a preponderance of
12 the evidence." *Church & Dwight Co., Inc. v. Abbott Laboratories*,
13 Civ. No. 05-2142, 2008 WL 5416383, at *5 (D.N.J. Dec. 23, 2008);
14 *see also A.C. Aukerman*, 960 F.2d at 1038 ("Elimination of the
15 presumption does not mean the [claimant] precludes the possibility
16 of a laches defense; it does mean, however, that the presumption of
17 laches plays no role in the ultimate decision.   The facts of
18 unreasonable delay and prejudice then must be proved [by a
19 preponderance of the evidence] and judged on the totality of the
20 evidence presented.")   The Court is convinced that FLIR has done so
21 here.

22        **a.   Unreasonable Delay**

23      The Court must balance six factors to determine whether
24 Fluke's delay in filing suit was unreasonable:  "(1) strength and
25 value of the trademark rights asserted; (2) [the] plaintiff's
26 diligence in enforcing mark; (3) harm to senior user if relief is
27 denied; (4) good faith ignorance by junior user; (5) competition
28 between senior and junior users; and (6) extent of harm suffered by

Page 33 - OPINION AND ORDER

the junior user because of senior user's delay." *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006) (quoting *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)). "While a court is guided by [the *E-System*] factors, ultimately, the doctrine of laches requires 'a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.'" *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 311 F. Supp. 2d 1023, 1030-31 (D. Or. 2004) (citation omitted).  Indeed, as Chief Judge Kozinski explained in his dissent in *American International Group, Inc. v. American International Bank*, 926 F.2d 829 (9th Cir. 1991): "*E-Systems* contemplates more than simple bead-counting.  The issue is not *how many* factors favor each party but their *weight*."  *Id.* at 838.

In this case, the balance tips in favor of FLIR.  The timeline of events leading up to FLIR's filing of this suit and totality of the evidence at trial is instructive.  On September 16, 2007, Fluke's senior product marketing manager, Michael Stuart ("Stuart"), sent an email to over sixty Fluke employees, stating: "On September 5th, [FLIR] officially introduced some new thermal imagers with what they say is 'F[LIR] Fusion.'"  (Trial Ex. 173 at 1.)  Seven months later, on April 15, 2008, Fluke's counsel, Heidi Sachs ("Sachs"), sent a cease and desist letter to FLIR's general counsel, William Davis ("Davis"), stating:

> It has come to our attention that F[LIR] recently
> commenced using IR FUSION for a camera that directly
> competes with Fluke's thermal imagers containing IR
> Fusion technology. . . .  Such use constitutes an
> infringement of Fluke's state and federal trademark
> rights and a violation of unfair competition laws.

1       . . . [I]n an the interest of an amicable resolution of
2       this matter, please confirm that F[LIR] will:

3       1.   Immediately cease use of IR FUSION, or any
            confusingly similar mark . . . .

4       2.   Provide an accounting of the materials
5             distributed, . . . Fluke will determine whether
            corrective advertising is necessary to rectify this
6             situation.

7       3.   Confirm that F[LIR] will not use, register or seek
            to register IR Fusion or any confusingly similar
8             mark. . . .

9 (Trial Ex. 142.)   The jury determined that Fluke knew or should

10 have known of its trademark-related claims no later than the date

11 of this cease and desist letter.

12     On April 22, 2008, Richard O'Brien ("O'Brien") of Sidley

13 Austin LLP in Chicago, Illinois, responded to Sachs' letter,

14 stating:

15       FLIR disputes that 'IR-FUSION' is a valid trademark and
      disputes that it had made any use of that term in a
16       trademark sense, versus a descriptive, generic, or other
      sense.  Nonetheless, in order to avoid devoting further
17       attention or incurring any expense with respect to this
      issue, FLIR has taken reasonable steps to avoid any use
18       of the term 'IR-FUSION' in any way that could even be
      argued to be a trademark use.  Specifically, FLIR has
19       taken steps to remove all of the uses on its website of
      the term 'IR-FUSION' that existed at the time you sent
20       your letter and has taken reasonable steps to recall and
      avoid further dissemination of any marketing materials
21       that so use the term.  We also assure you that although
      *FLIR plans to aggressively promote its own fusion*
22       *functionality*, FLIR has no intention of registering 'IR-
      FUSION' as a trademark or domain name.
23
      We trust that these steps bring this matter to an
24       end.

25 (Trial Ex. 143) (emphasis added).  It is clear on this record that

26 Fluke knew FLIR contested the validity of the Fluke trademark and

27 that FLIR intended to continue to promote its products' fusion

28 functionality aggressively.   All FLIR agreed to do was stop using

Page 35 - OPINION AND ORDER

1 the specific term IR Fusion.  There is no evidence in the record
2 before the Court of any communication by Fluke to FLIR about FLIR's
3 positions as expressed in its April 22, 2008 response letter.

4     In December 2008, Fluke conducted a consumers survey that
5 indicated that those surveyed "expect[ed]" thermal imagers to have
6 "[f]usion," which they "[a]ttributed to F[LIR]," and found "NO
7 differentiation in performance of [f]usion by brand." (Trial Ex.
8 146 at 32.)  As noted *infra*, despite this knowledge both pre- and
9 post-April 15, 2008, Fluke did not send its second cease and desist
10 letter to FLIR until August 5, 2010—almost four months after the
11 latest date the two-year laches period could have expired and not
12 until after FLIR had expressed concerns regarding Fluke's drop test
13 video.

14     In June 2009, Kirsten Paust ("Paust") became Fluke's general
15 manager of thermography and started to "monitor the advertising
16 that FLIR was doing that competed with" Fluke.  (Trial Tr. vol. 6a
17 [Docket No. 405], 1148:22-25, Dec. 14, 2012.)  As Paust explained,
18 "[i]t's just standard practice that anyone coming into this
19 position . . . would watch this stuff."  (Trial Tr. vol. 6a,
20 1149:1-2.)  During the remainder of that year, Paust observed that
21 FLIR continued to run advertisements that contained the term
22 "fusion" or a "derivation of fusion," as it said it would do in its
23 April 22, 2008 response letter.  (Tr. Tr. vol. 6a, 1149:23-1150:3.)
24 Over the course of the next year and a half, Paust was personally
25 aware of at least ten FLIR advertisements where the term "fusion"
26 was used.  (Trial Tr. vol. 6b [Docket No. 409], 1275:3-22, Dec. 14,
27 2012.)  Paust was not aware of any instances where FLIR used the
28

Page 36 - OPINION AND ORDER

term "IR-Fusion" post-2008, however.  (Trial Tr. vol. 6b, 1273:1-3.)

Despite Paust's knowledge of FLIR's continued use of allegedly confusingly similar terms, and the results of the late-2008 Fluke consumer survey showing, in Fluke's view, arguable dilution of Fluke's trademark that it considered its most important intellectual property, Fluke did nothing further to protect itself.[15]  Instead, Fluke appears to have set out on a course of almost vigilante-like punishment of FLIR.  It decided to exploit its perceived ruggedness advantage and produce a comparative advertisement focused nearly exclusively on FLIR's less rugged cameras, the drop test video advertisement which the jury determined was false.

In late-January 2010, Sierra performed and filmed a drop test video involving five thermal imaging cameras: a Fluke Ti32; a FLIR i7, i60, and T400; and a Testo 880-3.  Beginning in March 2010, Fluke published the video on Youtube, Facebook, and Twitter; made the video available to view and download on its website; and displayed the video at various trade shows.

In May 2010, FLIR hired outside counsel to look into Fluke's publication of the drop test video.  (Trial Tr. vol. 2a [Docket No. 417], 282:15-18, 291:5-10, Dec. 10. 2012.)  Teich testified that in mid-July 2010 FLIR's "internal counsel had [the] external law firm ask Sierra Media . . . for information about the video and to hold any documents that they had relative to" the drop test video.

---

[15] The Court notes the survey could well be showing that the public never identified fusion with Fluke for reasons quite apart from infringement of the Fluke mark.

1  (Trial Tr. vol. 2a, 281:22-25, 282:5-6, 291:5-11); (Jury Trial R.
2  [Docket No. 378], Ex. 1 at 72, 381:08-381:18, Dec. 10, 2012) ("Q.
3  Now, [Mr. Cardenas,] how did you learn that [your company, Sierra
4  Media,] was being sued over the -- over the drop test video?  A.
5  Somebody from FLIR's counsel called me demanding I turn over all
6  the footage.  I had a brief conversation with the them a[nd] --
7  basically I said, [n]o, it's not yours.  You can't have the
8  footage.  They were insisting that I had to turn it over to them.")

9        Teich testified that he believes Sierra Media referred FLIR's
10 mid-July 2010 request to Fluke's general counsel.  (Trial Tr. vol.
11 2a, 282:19-24.)  During the hearing on the post-trial motions, the
12 Court asked the parties to submit record citations concerning
13 Sierra Media's referral of FLIR's pre-litigation demand to Fluke's
14 general counsel.  FLIR pointed to Trial exhibit 2121, which was
15 marked for identification, but not admitted into evidence, as
16 demonstrating the basis for Teich's testimony.  (Trial Ex. 2121)
17 (indicating that FLIR's external counsel spoke with Sierra Media's
18 president on July 2, 2010, and told him to contact Fluke's general
19 counsel, whose contact information was provided, for assistance on
20 July 11, 2010).

21       At trial, Fluke argued that FLIR never complained about its
22 drop test video until after the second cease and desist letter. The
23 following excerpt of counsel's opening statement on behalf of Fluke
24 lays out this strategy:

25            Now, the video played on March 10, 2010.

26            And despite the fact that [FLIR's counsel] told you
27       in his opening that we had to get that video off there,
          there was no letter in March complaining about the video.
          No call.
28

Page 38 - OPINION AND ORDER

1       There was no letter or call, the evidence will show,
2  in April, the next month, from FLIR. No complaint at all.

3       The evidence will show that there was no complaint
   or letter or call complaining about the video in May. Or
4  in June. Or in July.

5       And then on August 17th, 2010, FLIR filed the
   complaint that brought us here today.

6       . . . .

7       So you may be left asking yourself when you hear the
   evidence, well, how come this lawsuit?
8
        And I think [FLIR's counsel] showed you a piece of
9  evidence that will be helpful for you to decide that. He
   showed you that letter that was sent to FLIR, complaining
10 about the fact that they had stolen Fluke's trademark.

11      And I don't know if you remember, but it was [dated]
   August 5th, 2010, just 12 days before they filed this
12 complaint relating to this drop video about which they
   knew they had suffered no harm.
13
        We had already warned them, in 2008, about taking
14 the trademark and using it.

15      . . . .

16      But then in 2010 the evidence will show they were at
   it again.
17
        And when we sent them a letter on August 5th, 2010,
18 saying, if you don't stop it this time, we're going to
   have to sue you.
19
        They wanted, the evidence will show, the first
20 strike. And so they filed this lawsuit . . . .

21 (Trial Tr. vol. 1b [Docket No. 400], 192:5-15, 193:7-18, 193:24-

22 194:5,  Dec. 7, 2012.)

23    As discussed above, the evidence supports a much different

24 conclusion.  With respect to the laches analysis, this evidence

25 strongly suggests and the Court finds that rather than enforce its

26 trademark, Fluke chose to ignore those rights in favor of a frontal

27 assault on the FLIR product line as less rugged than the Fluke

28 thermal imagers, and the jury determined it did this with false

Page 39 - OPINION AND ORDER

advertising.   Only when Fluke heard from its media and marketing
company that it had received inquiries seeking preservation of
documents regarding the drop test video did Fluke decide to seek
protection for its trademark.   This was more than two years after
Fluke complained about any use of the term IR Fusion or fusion, and
even longer since Fluke was first aware of FLIR's use of allegedly
offending fusion-related terms.   It was also well after FLIR
expressed its clear intention to keep using the term fusion.   The
record is clear that Fluke knew throughout the latter half of 2008
and during 2009 that FLIR in fact continued using the term fusion
as it said it would.

On August 5, 2010, Fluke sent its second cease and desist to
FLIR, wherein Sachs only cited one example—a September 1, 2008
press release—of an alleged infringing use by FLIR that
"appear[ed]" to (1) have been posted after FLIR's April 22, 2008
response to the original cease and desist letter and (2) "violate
the representations" made therein.   (Trial Ex. 144 at 1-2.)
Nowhere in the letter does Sachs mention when she first became
aware of the September 1, 2008 press release.   Twelve days later,
on August 17, 2010, after Fluke declined FLIR's proposed thirty-day
standstill period to allow the parties an opportunity to resolve
their differences, (Trial Ex. 1012 at 2), FLIR commenced this
action, asserting federal and state law claims based on the drop
test video, and seeking declarations of invalidity, non-
infringement, and unenforceability of Fluke's IR Fusion trademark.

When presented with Fluke's December 2008 consumer survey and
August 5, 2010 cease and desist letter, Fluke's own branding

Page 40 - OPINION AND ORDER

1   expert, Dr. Erich Joachimsthaler ("Joachimsthaler"), testified at

2   trial that Fluke was less than diligent in enforcing its mark:

3       Q.   Does [Trial Ex. 146] demonstrate [that] in December
             of 2008 . . . Fluke was aware that the marketplace
4            viewed fusion technology as attributed to FLIR?

5       A.   Yes.

6   (Trial Tr. vol. 5a [Docket No. 404], 1010:16-19, Dec. 13, 2012.)

7       Q.   [Trial Ex. 144] is a letter that was sent in August
             of 2010. Correct?
8
        A.   Yes.
9
        Q.   And it's referencing the fact that . . . Fluke
10           found a use of the words 'IR-Fusion,' apparently by
             FLIR, in September of 2008?
11
        A.   Yes.
12
        Q.   Almost two years prior.  Correct?
13
        A.   Yes.
14
        Q.   And in your opinion, is that proactively managing
15           your valuable brand?

16      A.   No. That's a big miss . . . .

17  (Trial Tr. vol. 5a, 1013:4-15.)  In a colloquy outside the presence

18  of the jury, the Court confirmed what Dr. Joachimsthaler meant when

19  he said, "[t]hat's a big miss":

20      THE COURT: Sir, I wanted to clear up the transcript in
        one respect.  There were two or three times that you were
21      asked a question and you gave an answer . . . [regarding]
        the topic of waiting [over] two years to . . . send a
22      second letter [cease and desist letter] . . . [a]nd you
        said something like, [t]hat was a big miss or big mess.
23      Which were you saying . . . ?

24      THE WITNESS: It's . . . a big miss.

25  (Trial Tr. vol. 5a, 1033:25-1034:7.)

26      THE WITNESS: Yeah, it's a missed opportunity . . . .

27  (Trial Tr. vol. 5a, 1034:13.)

28

Page 41 - OPINION AND ORDER

According to Teich, during that same time period, FLIR extensively marketed its own fusion functionality by using the term "fusion":

> During that period of time, [between April 2008 and August 2010], since we did not hear anything relative to the statement that we said that we were going to continue to aggressively promote our fusion functionality, we felt that Fluke would not have any objection to us using the term 'fusion.' So we invested a considerable amount of money in marketing FLIR fusion functionality during that period of time.
>
> Had we known that there was going to be an issue with that, we would have either resolved the issue at that time or chose some other means of marketing functionality [or not spent the money at all].

(Trial Tr. vol. 7b, 1605:12-23, 1606:9-10.) No evidence was presented contradicting the fact that FLIR invested a considerable amount of money in marketing its own fusion functionality.

In addition, Fluke only identified four instances at trial where FLIR used the term "IR Fusion," all of which were in small print on the specification page of the advertisement, and two of which indisputably occurred prior to the end of 2008. (*See* Trial Ex. 1101 at 2, using the phrase "IR Fusion Picture in Picture (PIP)," which was printed in about size 8 font in a FLIR press release dated September 1, 2008); (Trial Ex. 1227 at 12, FLIR advertisement stating "IR fusion picture in picture (PIP)," which is printed in about size 8 font); (Trial Ex. 1227 at 21, FLIR advertisement stating "IR fusion picture in picture (PIP)" in a similar font size); (Trial Ex. 1227 at 77, FLIR advertisement, copyright 2008, using the phrase "IR Fusion . . . Picture in Picture (PIP)-scalable IR image in visible light image" in an even smaller font size).

Page 42 - OPINION AND ORDER

1    Based on the foregoing, the Court concludes that Fluke's delay
2    in bringing suit was unreasonable.   Fluke offered no credible
3    explanation for its delay in light of its claim the IR Fusion mark
4    is its most prized intellectual property.   *See Danjaq LLC v. Sony*
5    *Corp.*, 263 F.3d 942, 955 (9th Cir. 2001) (holding that the
6    unreasonable delay element of laches was satisfied because the
7    claimant "offered no viable justification for the delay"); *see also*
8    *Am. Int'l Group,* 926 F.2d at 834 (Kozinski, J., dissenting)
9    ("Companies expecting judicial enforcement of their marks must
10   conduct an effective policing effort.")

### b.  Prejudice

12   FLIR must still satisfy the second prong of the laches test:
13   prejudice from Fluke's unreasonable delay in bringing suit.
14   *Internet Specialties*, 559 F.3d at 991.[16]   The Ninth Circuit
15   generally "recognizes two forms of prejudice in a laches context:
16   evidentiary and expectations-based." *Evergreen Safety Council v.*
17   *RSA Network, Inc.*, 697 F.3d 1221, 1227 (9th Cir. 2012).

18   As described above, Fluke's delay here caused expectations-
19   based prejudice because FLIR took actions or suffered consequences
20   that it would not have, had Fluke "brought suit promptly." *Id.*;
21   *cf. Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 999 (9th
22   Cir. 2006) ("A defendant may establish prejudice by showing that
23   during the delay, it invested money to expand its business or
24   entered into business transactions based on his presumed rights.")

25

---

26   [16] Conversely, in *Grupo Gigante SA De CV v. Dallo & Co., Inc.*,
27   391 F.3d 1088, 1101-05 (9th Cir. 2004), the Ninth Circuit merged
     the two laches elements and considered prejudice under *E-*
     *System's* sixth factor (harm suffered by the defendant because of
28   the plaintiff's delay).

1  Indeed, had Fluke "filed sooner," or at least explained that it
2  objected to FLIR's use of the term fusion after receiving its April
3  22, 2008 response letter, FLIR "*may have* chosen an alternative
4  marketing position." *Jarrow*, 304 F.3d 829 (citation omitted)
5  (emphasis added).   The Court rests its holding on, among other
6  things, the public association that FLIR has built between the term
7  fusion and its thermal imagers, as demonstrated (at its infancy) by
8  Fluke's December 2008 consumer survey. *See Internet Specialties*,
9  559 F.3d at 992 (recognizing that a finding of prejudice can rest
10 on a similar conclusion).[17]

11     Moreover, while expectation-based prejudice alone is
12 sufficient, *see Petrella v. Metro-Goldwyn-Mayer, Inc.*, 695 F.3d
13 946, 953 (9th Cir. 2012) ("We conclude that expectations-based
14 prejudice exists here, so we need not consider evidentiary
15 prejudice"), Fluke's delay also caused evidentiary prejudice.
16 "Evidentiary prejudice includes such things as lost, stale, or
17 degraded evidence." *Danjaq*, 263 F.3d at 955.  At trial, Fluke's
18 counsel took FLIR's secondary meaning survey to task, arguing that
19 it lacked any evidentiary or legal significance as to the alleged
20 invalidity of Fluke's trademark because it was conducted in early
21 2012—several years after the marketplace had been subjected to the
22 effects of FLIR's trademark infringement. (*See, e.g.,* Trial Tr.
23 vol. 6b, 1365:19-1366:21.)  Based on the lack of an objection to

24

25     [17] The Court also notes that there is evidence in the record
26 to support a conclusion that the result of the December 2008 Fluke
   consumer survey was as much or more due to FLIR's earlier
27 development of the fusion functionality, as it was due to any FLIR
   advertising in the 2008 time period after FLIR's April response to
28 the first cease and desist letter.

Page 44 - OPINION AND ORDER

FLIR's claim to be legitimately using the term fusion, and the use of that term from April 2008 through August 2010, it is hardly surprising that FLIR did not have a secondary meaning survey conducted until after Fluke filed its claim for trademark infringement.

As Fluke itself points out, "deficiencies in the timeliness of the survey . . . goes to the weight afforded the survey." *Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc.*, No. 1:04-CV-2112-CAP, 2007 WL 4563873, at *9 (N.D. Ga. July 17, 2007). Which is why Fluke was adamant that the jury be provided an instruction indicating that timing is important because "the crucial date for determining whether a mark has secondary meaning through acquired distinctiveness 'is the date on which the alleged infringer entered the market with the disputed mark or term.'"[18]  *Learning Internet v. Learn.com, Inc.*, No. CV 07-227-AC, 2009 WL 6059550 (D. Or. Nov. 25, 2009) (quoting *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005)).  Fluke cannot argue to the jury on the one hand that this survey by FLIR is entitled to little weight given its timing, and later argue that FLIR's evidence was not negatively affected by the delay in its origination.  The Court finds any delay and lesser weight to be given to FLIR's survey was factually due to Fluke's failure to object to FLIR's April 2008 response and assertion of its rights until August 2010.

The weight accorded to FLIR's survey was vital to its defense because, in the Court's view, IR Fusion is at best a descriptive

---

[18] Here there is evidence of FLIR's use of the term "FLIR Fusion" as early as September 2007.  (Trial Ex. 173.)

Page 45 - OPINION AND ORDER

term that required the acquisition of secondary meaning in order to enjoy trademark protection. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 n.19 (9th Cir. 1999) ("Descriptive terms directly describe the quality or *features of the product*.") (emphasis added); *Rudolph Intern., Inc. v. Realys, Inc.*, 482 F.3d 1195, 1197 (9th Cir. 2007) (descriptive terms generally do not enjoy trademark protection, unless they have acquired secondary meaning in the minds of consumers).

### c.   Willfulness Exception to Laches

Fluke claims that FLIR's "bad faith alone defeats its affirmative defense of laches." (Fluke's Opp'n FLIR's Mot. [Docket No. 443] at 30.) "Over the past eighty-five years, various courts have held that laches does not bar a suit against a deliberate infringer." *Danjaq*, 263 F.3d at 956. This willfulness exception has been applied by the Ninth Circuit in the trademark arena. *See id.* at 957 ("The attempted proof of laches is too trivial to require serious consideration. In the light of the intentional and fraudulent use of appellant's trade mark, the defense here is a frivolous one." (quoting *Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir. 1955))). For the purposes of this exception, "the term 'willful' refers to conduct that occurs with knowledge that the defendant's conduct constitutes [trademark] infringement." *Id.* (internal quotation marks and citation omitted).

In this case, the evidence is insufficient to demonstrate that FLIR engaged in conduct with knowledge that it constituted trademark infringement. The record before the Court tells the following story. On April 15, 2008, outside counsel for Fluke wrote the first cease and desist letter to FLIR complaining of

Page 46 - OPINION AND ORDER

1  FLIR's use of IR Fusion and fusion.   On April 22, 2008, FLIR

2  responded to Fluke stating that FLIR planned on aggressively

3  promoting its own fusion functionality and agreeing to no longer

4  use IR Fusion.   FLIR's use of the term fusion, which it believed

5  described a *feature* of its thermal imaging cameras, continued

6  unabated (as Fluke was well aware) until August 2010, not long

7  after FLIR asked Sierra Media to preserve and/or turn over evidence

8  pertaining to the drop test video.   Perhaps most tellingly, on July

9  1, 2010, before FLIR made its demand on Sierra Media, Fluke

10 submitted an application to the United States Patent and Trademark

11 Office ("PTO"), which stated the following:

12         Those skilled in the art [of thermography] call th[e]
           merging of images 'fusion[.]' . . . A variety of methods
13         for presenting a thermal image fused with a corresponding
           visible light image are known in the art, one example of
14         which is known as *FLIR Triple Fusion* . . . , wherein an
           infrared image may be moved, resized and reshaped inside
15         a visible light image.

16 (Trial Ex. 197 at 4) (emphasis added).   Clearly FLIR did not

17 knowingly engage in conduct that it believed constituted trademark

18 infringement.   *See Danjaq*, 263 F.3d 942 (willfulness exception

19 inapplicable where party can "show at most only infringement, not

20 willful infringement.")

21        In sum, the Court concludes that FLIR has demonstrated both an

22 unreasonable delay and that it was prejudiced such that the laches

23 defense applies here.   Because Fluke's trademark-related claims are

24 barred, the Court denies Fluke's request for the Court to enter

25 judgment in its favor on those claims.   Instead, judgment

26 dismissing the trademark-related damages claims is appropriate.

27 ///

28 ///

Page 47 - OPINION AND ORDER

1      **2.   Injunctive Relief**

2          "It has often been said that laches is generally not a bar to

3    prospective injunctive relief." *Jarrow Formulas*, 304 F.3d at 840.

4    Often times "the defendant will not be prejudiced by a bar on

5    future conduct" because "[l]aches stems from prejudice to the

6    defendant occasioned by the plaintiff's past delay . . . [and] the

7    plaintiff's past dilatoriness is [typically] unrelated to a

8    defendant's ongoing behavior that threatens future harm." *Id.*

9    (citation omitted).  "Injunctive relief is the remedy of choice for

10   trademark . . . cases, since there is no adequate remedy at law for

11   the injury caused by a defendant's continuing infringement."

12   *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th

13   Cir. 1988).  In the Court's view, prospective injunctive relief can

14   be fashioned in such a way that will not prejudice FLIR and will

15   protect Fluke against any continued use of its trademark.  The

16   Court will set a hearing at a later date to address the terms/

17   scope of Fluke's injunction.

18     **3.   Attorney's Fees and Costs**

19         For the reasons discussed *supra*, Part II.B.3., the Court will

20   examine the relief awarded to Fluke and the unlawfulness of FLIR's

21   conduct in assessing Fluke's request for attorney's fees under §

22   1117(a).  "[G]enerally a trademark case is exceptional for purposes

23   of an award of attorneys' fees when the infringement is malicious,

24   fraudulent, deliberate or willful." *Lindy Pen Co. v. Bic Pen

25   Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993)*; see also Watec*, 403

26   F.3d at 656 (exceptionality is question of law for the district

27   court).  In this case, the Court has determined that Fluke is

28   entitled to an injunction which weighs heavily in favor of awarding

Page 48 - OPINION AND ORDER

attorney's fees. *See TrafficSchool*, 653 F.3d at 832 (citing cases where plaintiffs were entitled to attorney's fees when the district court awarded an injunction but not damages). As to the unlawfulness of FLIR's conduct, it will be considered at the time of the hearing on the terms of the injunction and if fees are to be awarded, Fluke will then be directed to submit its fee application with appropriate supporting materials.

### 4. Prejudgment Interest

Fluke "requests that the Court order prejudgment interests on the $4,136,975 awarded by the jury." (Fluke's Mem. Supp. [Docket No. 434] at 20.) As stated in Part II.B.4., an award of prejudgment interest is a matter left to the discretion of the district court. *Cyclone USA*, 2010 WL 2132378, at *1. As with FLIR, the Court has determined that Fluke is not entitled to prejudgment interest since Fluke's trademark-related claims are barred by laches. *See Brittingham v. Jenkins*, 914 F.2d at 457 (reversing award of prejudgment interest on Lanham Act claim based on application of equitable defense).

### 5. Invalidity

In the alternative, FLIR argues that it is entitled to JMOL that Fluke's mark is invalid or, alternatively, a new trial on the issue of invalidity. In support of this assertion, FLIR claims that "IR Fusion" and "fusion" are "descriptive of the technological process of blending infrared and visible light images, and no secondary meaning exists with either of these terms." (FLIR's Mem. Supp. [Docket No. 436] at 34.)

Without deciding the issue, the Court notes that it has little difficulty concluding that "IR Fusion" is a descriptive term.

Page 49 - OPINION AND ORDER

1  "Descriptive terms directly describe the quality or features of the
2  product." *Brookfield*, 174 F.3d at 1058.  They convey "an immediate
3  idea of the ingredients, qualities or characteristics of the
4  goods." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d
5  4, 11 (2d Cir. 1976).  Throughout the course of the litigation,
6  Fluke has represented and the evidence has clearly established that
7  IR Fusion "signifies a *feature* that enables a handheld thermal
8  imager equipped with a digital camera to overlay . . . a visible
9  and thermal image."  (Fluke's Resp. Opp'n FLIR's Mot. Summ. J.
10 [Docket No. 200] at 2) (emphasis added).  Indeed, Fluke's own
11 survey in December 2008 indicates consumers consider fusion
12 technology "table stakes" (i.e., a basic feature included on a
13 thermal imager) and "expect products to have Fusion."  (Trial Ex.
14 146 at 32.)  The real issue, then, is whether Fluke proved
15 "secondary meaning" at trial.  *See Lahoti v. Vericheck, Inc.*, 636
16 F.3d 501, 505-06 (9th Cir. 2011) ("[A] descriptive mark that lacks
17 secondary meaning is not distinctive and is not entitled to
18 trademark protection.")

19       The Second Circuit faced similar circumstances in *PaperCutter,*
20 *Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558 (2d Cir. 1990).  There,
21 following a bench trial, the district court held that there was no
22 infringement of the plaintiff's trademark, but upheld the
23 registration of the mark because it had acquired secondary meaning.
24 *Id.* at 559.  On review, the Second Circuit granted the cancellation
25 of the plaintiff's trademark because it failed to meet the burden
26 of establishing that its descriptive mark had acquired secondary
27 meaning.  *Id.* at 565.  The Second Circuit emphasized that (1) it
28 had "no doubt" the plaintiff's trademark was purely descriptive;

Page 50 - OPINION AND ORDER

and (2) the "burden [to prove secondary meaning] d[id] not shift upon a decision of the [PTO] to register the mark, absent evidence that the [PTO] registered the mark upon finding that it had acquired secondary meaning." *Id.* at 563-64.

Here, the PTO registered the "IR Fusion" mark, without requiring proof of secondary meaning, in early June 2008. Thus, as in *PaperCutter*, Fluke bore the "burden of proving by a preponderance of the evidence that [its] mark had acquired secondary meaning at the time [FLIR] began [its] allegedly infringing activities." *Morgans Group LLC v. John Doe Co.*, No. 10-CV-5225, 2012 WL 1098276, at *5 (S.D.N.Y. Mar. 31, 2012) (citation omitted). FLIR contends Fluke did not meet its burden.

Whether FLIR meets the standard for JMOL or a new trial on the issue of validity is a close issue. While Fluke presented some evidence on various factors considered for secondary meaning, significantly, a little over a year after Fluke became aware that FLIR "introduced some new thermal imagers with what [it said was] 'F[LIR] Fusion,'" (Trial Ex. 173 at 1), and just six months after the PTO registered the "IR Fusion" mark, Fluke conducted a survey which indicated that consumers expect thermal imagers to be equipped with fusion technology. *See Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1395 (9th Cir. 1993) ("Consumer perceptions are relevant in determining whether a non-inherently distinctive mark has acquired secondary meaning and should therefore be treated as a strong mark.")

In order to "establish that a descriptive term has secondary meaning, the plaintiff *must show* that the primary significance of the term in the minds of the consuming public is not the product

1 [or feature of the product] but the producer." *Transgo, Inc. v.*
2 *Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985)
3 (emphasis added). If consumers considered fusion technology "table
4 stakes," "expect[ed] products to have Fusion," and saw "NO
5 differentiation in performance of Fusion by brand" in December
6 2008, (Trial Ex. 146 at 32), it seems highly unlikely that the
7 significance of the term "IR Fusion" in the minds of the consuming
8 public could have been anything other than a feature of the product
9 or any thermal imager a little over a year earlier.

10     FLIR's secondary meaning survey lends credence to this
11 interpretation. "Many cases recite that proof of secondary meaning
12 is sufficient if it shows that a 'significant' or 'substantial
13 part' of the buying class use the designation to identify a single
14 source." 6 *McCarthy on Trademarks & Unfair Competition* § 32:190
15 (4th ed. 2013). Although figures over 50% are regarded as clearly
16 sufficient, figures of 46% and 37% have also been found sufficient.
17 *Id.* In this case, FLIR's secondary meaning survey indicated that:
18 (1) 34% of respondents associated the term "IR Fusion" with thermal
19 imaging cameras; (2) 9% associated the term "IR Fusion" with Fluke;
20 and (3) the measured level of secondary meaning in the term "IR
21 Fusion" was only 7%. *See Levis Strauss & Co. v. Blue Bell, Inc.*,
22 778 F.2d 1352, 1358 (9th Cir. 1985) ("An expert survey of
23 purchasers can provide the most persuasive evidence on secondary
24 meaning.") Even though FLIR's secondary meaning survey was
25 conducted in early 2012, it seems doubtful that a "significant" or
26 "substantial part" of thermal imager buyers used the designation to
27 identify a single source in September 2007 or at any other time
28 based on the evidence in this record. Fluke's own survey in

1  December of 2008 showed "the buying class" considered fusion
2  technology "table stakes" and "expect[ed] products [i.e., all
3  thermal imagers] to have Fusion."  "[T]he evidentiary burden
4  necessary to establish secondary meaning is substantial where the
5  mark applie[s] to an article designate[d] a principal ingredient
6  desired by the [buying class]."  *Aloe Creme Laboratories, Inc. v.*
7  *Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir. 1970), *cert. denied*, 398
8  U.S. 928 (1970).

9      Ultimately, however, given the record in this case, the laches
10 defense discussed above is the clearest reason Fluke's damages
11 award cannot be upheld.  The laches analysis (1) moots the closer
12 question of whether Fluke established secondary meaning for its
13 mark; (2) accounts for any prejudice FLIR may have suffered in
14 defending itself; and (3) allows the Court to address Fluke's
15 injunctive relief claim as an appropriate framework to address the
16 protection Fluke may be entitled to, and FLIR's ability to promote
17 its own fusion technology.  Thus, it is not necessary to rule on
18 whether FLIR is entitled to JMOL that Fluke's mark is invalid or a
19 new trial on the issue of invalidity.

20 **D.  Fluke's Remaining False Advertising Claims**

21     The jury found that two FLIR advertisements—"T-Series Line Up,
22 Comparison to the Fluke Ti32," (Trial Ex. 1171), and "Why FLIR for
23 Architectural Testing?," (Trial Ex. 1183)—were false in violation
24 of the Lanham Act.  (Special Verdict Form at 6, Interrogs. 19-20.)
25 Fluke therefore argues that it is entitled to entry of judgment and
26 permanent injunctive relief with respect to those advertisements.
27 FLIR, on the other hand, argues that the Court should not issue any
28 injunctive relief to Fluke because (1) Fluke presented no evidence

Page 53 - OPINION AND ORDER

1   at trial demonstrating the scope of FLIR's use of these two
2   PowerPoint presentations, such as where, when, or for how long
3   those two promotional materials were actually disseminated to the
4   public in interstate commerce; (2) the two PowerPoint presentations
5   have copyright dates of 2009 and were intended to be used only for
6   internal sales training purposes and not interstate commerce; and
7   (3) FLIR has ceased all use of those two materials and instituted
8   controls to prevent their further use and dissemination.

9        "[A] plaintiff is not automatically entitled to an injunction
10  even if it proves its affirmative claims." *Contessa Food Prods.,*
11  *Inc. v. Lockpur Fish Processing Co., Ltd.*, Civ. Nos. 9808218, 99-
12  4783, 2003 WL 25778704, at *7 (C.D. Cal. Jan. 29, 2003). As Fluke
13  appropriately notes in opposition to FLIR's request for permanent
14  injunctive relief with regard to the drop test video, a defendant's
15  voluntary cessation of its alleged unlawful conduct moots the need
16  for a permanent injunction, so long as the defendant's reform is
17  irrefutably demonstrated and total. *See Polo Fashions*, 793 F.2d
18  at 1135. According to FLIR's director sales in the United States,
19  Brent Lammert ("Lammert"), "FLIR has instructed all its sales and
20  marketing personnel that those two power point presentations may
21  never be used again, to any extent." (Lammert Decl. ¶ 4.) Unlike
22  the supposed cessation of the drop test video, the Court has not
23  been provided with supplemental declarations citing examples that
24  refute Lammert's statements. Accordingly, Fluke's claim for
25  injunctive relief is now moot. *See Contessa*, 2003 WL 25778704, at
26  *8 (stating that "the court finds that [the defendant]'s claim for
27  injunctive relief is now moot, as the allegedly wrongful behavior
28  cannot reasonably be expected to recur.")

**E.    Renewed Motions for JMOL**

Consistent with the prior rulings, the Court (1) denies FLIR's renewed motion for JMOL on Fluke's unclean hands defense; (2) denies Fluke's renewed JMOL on FLIR's false advertising claim; (3) denies Fluke's renewed JMOL on FLIR's laches defense; and (4) denies as moot FLIR's renewed motions for JMOL concerning laches and Fluke's entitlement to injunctive relief as to the two advertisements discussed in Part II.D., (*see* FLIR's Mot. Post-Trial Relief at 3.)

Fluke has also renewed its motion for JMOL on its false advertising claim regarding FLIR's use of superimposed imagery. Fluke's argument, in its entirety, is as follows: "[T]he jury's verdict . . . is contrary to the evidence." (Fluke's Mem. Supp. at 26.)  This argument is entirely unpersuasive.  "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).  Because substantial evidence supported the jury's verdict here, Fluke's renewed motion for JMOL is denied.

**F.    Fluke's Redaction Request**

On January 4, 2013, Fluke filed a notice of intent to redact the trial transcripts, and subsequently filed its redaction request on January 22, 2013.  In that request, Fluke sought redaction of certain trial testimony regarding its sales and profits.  FLIR's opposition to Fluke's request aptly summarizes the Court's position on this matter: "[T]he Court was clear . . . [at] the start of trial that if the parties intended to seek to exclude the public

Page 55 - OPINION AND ORDER

1   from any part of the trial or would later seek to seal particular

2   trial testimony or evidence, they would need to submit legal

3   authority for that position.  Fluke, however, failed to do so."

4   (FLIR's Resp. Fluke's Redaction Request [Docket No. 426] at 2.)

5   Fluke's redaction request is denied.

### III. CONCLUSION

7       For the reasons stated, Fluke's redaction request (Docket No.

8   422) is DENIED; Sierra's motion (Docket No. 431) for attorney's

9   fees under § 1117(a) is DENIED; Fluke's motion (Docket No. 433) re:

10  post-trial issues is GRANTED in part and DENIED in part; and FLIR's

11  motion (Docket No. 435) for  post-trial relief, judgment as a

12  matter of law, or alternatively, for a new trial is GRANTED in part

13  and DENIED in part.

14      IT IS SO ORDERED.

15      Dated this 8th day of August, 2013.

16                          /s/ Dennis J. Hubel

17                          _____
                                 DENNIS J. HUBEL
18                          United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

Page 56 - OPINION AND ORDER